William J. Burke, J.
This motion was originally brought on by a show cause order returnable before the court on October 21, 1974. Prior to that time the Onondaga County Grand Jury had returned indictments numbered 74-331, 332, which charged six defendants with various crimes that were alleged to have occurred on the 23rd day of July, 1974. The place of the alleged crimes was on the property of the Onondaga Indian Reservation, which is located entirely within the County of Onondaga, State of New York.
The incident was the culmination of an attempt by the Council of Chiefs of the Onondaga Nation to remove non-Indians from living on tribal lands (Onondaga Indian Reservation).
The beginning of this controversy (non-Indians living on the reservation) began when the Council of Chiefs asked an Indian landlord to tell his all-white tenant family to move and vacate property on which they have resided for a number of years. This prompted the discussion of other “white” people living on the reservation and should they also be forced to leave.
This question of non-Indians living on the reservation had come up in the past. In 1922 and again in 1968 it was passed in council that non-Indians would be asked to leave, with the exception of those already there and married to Indians.
*238 In March of 1974 the Council of Chiefs unanimously passed a law to bar all non-Indians from the reservation, regardless of tenure or family affiliations.
Removal notices were served on all non-Indians and the Council of Chiefs requested the help of the United States Department of Justice. The Justice Department after reviewing the matter determined that the removal should be handled by the State of New York through the local District Attorney’s office.
On June 28, 1974 the Onondaga District Attorney in a letter to the Council of Chiefs offered his help in effecting this removal pursuant to section 8 of the New York State Indian Law.
On July 23, 1974, with no attempt by the Council of Chiefs to invoke the aid of section 8 of the Indian Law the warriors, chiefs, clanmothers and supporters moved from one home to another physically removing families of non-Indians, resulting in the alleged threats and forceful entries that produced the indictment now under consideration by this court.
The order to show cause was summarily denied by this court on its return date as none of the defendants had been arraigned under the several indictments.
It was thereafter agreed by the court that one defendant, namely Horace Cook, would appear and be arraigned under indictment No. 74-331, and that the court would then consider the many points raised by the defendant in the original show cause order and treat the application as a motion to dismiss.
This agreement by the court to have defendant Cook appear was effected by certain members of the Council of Chiefs, their attorney and this court in a meeting held on the Onondaga Reservation with the understanding that the court would rule on the defendant’s motion to dismiss and would further allow members of the Council of Chiefs to be heard orally or in written application addressed to the merits of this problem. These chiefs in the meetings with the court agreed to produce the other defendants in court voluntarily, if such was necessary, without the need of police agencies going out to the Onondaga Reservation to serve warrants of arrest.
No oral arguments were heard by the court, as the parties agreed to submit written briefs on their respective positions. The brief of the defendant was not received until January 15, 1975, due to the illness of the defendant’s attorney, and in *239 addition to the brief of the defendant the court was furnished an amicus curiae memorandum from the California Indian Legal Services. No independent statement from the Council of Chiefs was received by the court.
It is with this background that the following decision is rendered.
Point I
The defendant contends, first of all, that this indictment should be dismissed for the reason that each count fails to state sufficient facts to constitute an offense against the law of the State of New York.
Although the defendant does not specifically state, CPL 200.50 (subd 7) sets out what an indictment must contain. CPL 200.50 (subd. 7) requires: "A plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of the offense charged and the defendant’s or defendants’ commission thereof with sufficient precision to clearly apprise the defendant or defendants of the conduct which is the subject of the accusation.”
This statute imposes a greater duty upon the People to plead the facts constituting the alleged crime with precision and particularity than was imposed upon them under the predecessor statute (Code Grim. Proc., § 275 subd. 2). That statute required merely: "A plain and concise statement of the act constituting the crime, without unnecessary repetition.”
This court has reviewed the factual allegations of both indictments and finds that they meet the requirements of CPL
200.50 (subd 7). This defendant, as well as the other defendants, have been sufficiently apprised of the conduct which is the subject of the accusations against them.
Point II.
The defendant’s second argument contends that the indictment should be dismissed for lack of jurisdiction and improper venue.
The basis of this contention arises from the early days of the country’s history and the view of Indians and the consequence of Indian treaties wherein the concept of Indian sovereignty was historically rooted and set out in order to assure *240 the members of the various Indian Nations that their right to self-government over their internal affairs would be preserved.
The concept of leaving Indians free from State jurisdiction and control is deeply rooted in our nation’s history. This policy was first articulated by the Supreme Court approximately 143 years ago when Chief Justice Marshall held that Indian Nations were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all lands within those boundaries, which is not only acknowledged, but guaranteed by the United States.” (Worcester v Georgia, 6 Pet. [31 US] 515, 557 [1832]). It followed from this concept of Indian reservations as separate, although dependent Nations, that State law could have no role to play within the reservation boundaries. However, this doctrine has undergone considerable evolution in response to changing times, as the landmark case of Williams v Lee (358 US 217, 218 [1959]) clearly states: that as a result of conquests and treaties the Indians were induced to give up complete independence in exchange for Federal protection, aid and grants of land.
It was at this point in our history that a tremendous conflict relating to the right to control matters relative to Indians arose between the Federal Government and the various State governments when the land set aside for Indian reservations fell within the borders of the States. The Federal Government argued that it derives its power to deal with Indian affairs from our Constitution (art I, § 8, subd. 3) and that essentially the State’s power to deal with Indian affairs must be manifested by and through the acts of Congress. However, since the days of this conflict, as stated in Williams v Lee (supra, pp 220-221): "Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantages to them * * * Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which Worcester v Georgia has denied.”
The Congress of the United States in furtherance of this purpose granted to the State of New York criminal jurisdiction over New York Indian reservations (US Code, tit 25 § 232). This section states in part that: "The State of New *241 York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State”.
Additionally, under section 8 of the Indian Law jurisdiction over disputes arising from intrusions on tribal lands is vested in the County Judge of the county in which those lands are situated.
Therefore, as to this point, it is apparent that the courts of the State of New York have the jurisdiction to consider criminal charges arising out of conduct committed on Indian lands located within the State.
Point III
The defendant further contends that the facts alleged in the indictment are not within the provisions of articles 135 and 140 of the Penal Law.
Relative to this contention, the facts alleged in these indictments do fall within the above two articles. There still remains, however, for trial proof by the People establishing beyond a reasonable doubt that the defendants did, in fact, commit acts alleged in the instant indictments, in such a manner as to become criminally liable therefor.
Point IV
The defendant contends also that the indictments should be dismissed because section 232 of title 25 of the United States Code is unconstitutional, being in violation of treaties between the Indians and the United States and being enacted without their consent.
As stated earlier, history has shown that the Federal Government and the governments of the various States continually quarrelled about the jurisdiction of each government body to control the affairs of the Indians within their territorial boundaries. Although there was much controversy, it can be stated that the Federal Government’s power to deal with Indians can be characterized as plenary in nature (see Matter of Heff, 197 US 488 [1905]; United States v Kagama, 118 US 375 [1886]), and that while for many years the United States has recognized some element of sovereignty in the Indian tribes and dealt with them by treaty, Congress, by act of *242 March 3, 1871 (US Code, tit 25, § 71) prohibited the further recognition of Indian tribes as independent nations. Section 71 of title 25 of the United States Code asserted the right of the Government to define the rights of Indians with or without their consent. (United States v Santa Fe, Pacific R.R. Co., 114 F2d 420). Thereafter, the Indians and Indian tribes were regulated by acts of Congress. This method to govern by statute rather than treaty has been sustained. (See United States v Kagama, supra; also United States v Black Feet Tribe of Black Feet Indian Reservation, 364 F Supp 192.)
In exercise of this power (the power to enact legislation) the Congress of the United States lawfully delegated a portion of its control over New York Indians to the State of New York, by enacting section 232 of title 25 of the United States Code. Thus, the constitutional grant of power to the Federal Government to regulate commerce with the Indians does not in this court’s opinion preclude the Congress from granting some measure of control over Indians and Indian affairs to the States, including the exercise of State criminal jurisdiction over crimes committed on Indian reservations by Indians. (See Robinson v Wolff, 349 F Supp 514; Rincon Band of Mission Indians v County of San Diego, 324 F Supp 371; McClanahan v Arizona State Tax Comm., 411 US 164; Oneida Indian Nat. v County of Oneida 414 US 661.) In Rincon (supra), the United States Southern District Court of California upheld a statute similar to section 232 of title 25 of the United States Code. The court stated (p 378): "There is no doubt that a residual sovereignty remains in Indian tribes even in those states where Public Law 280 operates. There is nothing in policy or law however, which indicates that this limited self government inherent in the Indian tribes may rise to challenge State law.”
Accordingly, the court holds that: "San Diego County gambling ordinance is in full force and effect on Rincon Reservation and may be enforced there by defendants.”
There can be no doubt that section 232 of title 25 of the United States Code was a valid exercise of Congressional power, having not as its object to destroy the self government of the Indians, but to put to rest the conflict between the Federal and State Government by a clear-cut delineation of State and Federal power with respect to a specific area of the law, in the hope that energies might be diverted from the jurisdictional disputes to the furtherance of Indian welfare.
*243 Point V
The defendant further contends the indictment should be dismissed because the Indians have been systematically excluded from the grand jury and that the grand jury was not composed of members of their race.
The basis of this contention stems from the fact that in Onondaga County, the selection of possible jurors for grand jury duty is made from voter registration lists and this, coupled with the fact that Indians do not vote, results in the exclusion of Indians from the grand jury and petit jury panels in this county.
Therefore, the argument in part is that individuals who have not registered to vote constitute a cognizable and definite group or class in the community and that exclusion of that class or group from jury service results in juries which do not represent a cross section of the community.
Additionally, that the Indians themselves are a definite group that make up part of the community.
Having considered the contentions of the defendant, what must be shown in order for the jury selection process to be constitutionally invalid?
The court in Alexander v Louisiana (405 US 625, 628) stated: "Although a defendant has no right to demand that members of his race be included on the grand jury that indicts him, Virginia v Rives, 100 US 313 (1880), he is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice.”
Our own Court of Appeals in People v Chestnut (26 NY2d 481, 488) stated: "In order to sustain a claim of an illegally constituted jury, it is essential, we have held, that intentional and systematic discrimination must be proved.” (See People v Agron, 10 NY2d 130.)
The court, in People v Ferguson (55 Misc 2d 711, 718-719) stated: " 'A defendant in a criminal case has no constitutional right to be indicted or tried by any particular jury, or by a jury composed in part of members of his race or class’. [Cites omitted.] Only where there is an intentional, deliberate and systematic exclusion of, or discrimination against members of a particular political or economic group, religion, faith or race or sex in the summoning and selection of jurors is there an infringement of the right to due process and equal protection of the law.”
*244 The court went on to state (p 719): "As with all claims of constitutional violations, to raise an issue as to the constitutionality of the impaneling of a grand jury or petit jury a factual demonstration that there is in truth such an issue is required. (Darcy v Handy, 351 US 454, 462; Hawk v Olson, 326 US 271, 277; Walker v Johnston 312 US 275, 286; People v Richetti, 302 NY 290, 297; cf People ex rel. Eich v Wilkins, 17 NY2d 621.) A mere conclusory and factually unsupported statement that the Grand Jury was unconstitutionally formed in that there was a systematic and intentional exclusion of members of a particular race does not create an issue.” (Cases cited.)
Does the use of voter registration lists result in intentional and systematic exclusion of Indians?
The United States Court of Appeals in Camp v United States (413 F2d 419) has answered the question in the negative. The court stated (p 421): "Use of such lists as the sole source of names for jury duty is constitutionally permissible unless this system results in the systematic exclusion of a 'cognizable group or class.’ (Grimes v United States, 5 Cir 1968, 391 F2d 709, cert denied, 393 US 825, 89 S Ct 87, 21 L Ed 2d 96; Rabinowitz v United States, 5 Cir 1966, 366 F2d 34. This Court and others have held that those who do not choose to register to vote cannot be considered a 'cognizable group’. [Cases cited.] The fact that some persons may from religious conscience or otherwise choose not to register to vote does not, in our view, convert that subclass of nonvoters into a 'cognizable group.’ ”
The court, in United States v Gast (457 F2d 141) would answer the above question in the negative. The court stated (p 142): "The use of voter registration lists (28 USC § 1863) has been upheld as a permissible means of grand jury selection. (United States v Dangler, 422 F2d 344 (5th Cir 1970); United States v Butera, 420 F2d 564, 573 (1st Cir 1970); Camp v United States, 413 F2d 419 (5th Cir 1969); Grimes v United States, 391 F2d 709 (5th Cir 1968); United States v Kelly, 349 F2d 720, 778 (2nd Cir 1965). And there is no requirement that a grand jury be a statistical mirror of the community, United States v Tommaso, 405 F2d 385, 389 (4th Cir 1968) or that it conform to proportionate strength of each identifiable group in the total population, Simmons v United States, 406 F2d 456, 461 (5th Cir 1969).”
The court in United States v Kroncke (321 F Supp 913) a *245 case involving the use of voter registration lists exclusively stated (p 914): "It is true that non-voters are not drawn as jurors since voting lists of actual or registered voters are the source of names. Jury duty is regarded both as a duty and as a privilege, and to be eligible therefor one must be a registered or actual voter. Those who wish to disassociate themselves from the political process by not voting forfeit the right to be selected on either a grand or petit jury.”
The court went on to cite the case of United States v Caci (401 F2d 664) which stated at page 671 of that opinion, that: "It is well established that the use of voter registration lists as the source of names of prospective jurors is not unlawful because it results in the exclusion of non-voters.”
And the court in Hallmann v United States (490 F2d 1088) stated (p 1092): "Further, absent a showing of systematic exclusion of a class of qualified citizens, voter registration lists may be used as the only source of persons to serve on grand and petit juries. E.g. United States v Parker, 428 F2d 488, 489 (9th Cir.) cert denied, 400 US 910, 91 S Ct 155, 27 L Ed 2d 150 (1970); United States v Butera, 420 F2d 564, 573 (1st Cir. 1970); Camp v United States, 413 F2d 419, 421 (5th Cir.) cert denied, 396 US 968, 190 S Ct 451, 24 L Ed 2d 434, (1969); United States v Kroncke, 321 F Supp 913, 914-916 (D Minn 1970).”
Thus it is clear that the use of voter registration lists is not an unconstitutional process in the selection of jurors for both grand or petit jurors, and, further, that this group of nonvoters is not considered by the courts as a "cognizable group” within the community which may be the subject of prejudice. Therefore, if Indians choose not to vote as the defendant contends, although no factual support for this general statement has been offered, they are not for that reason unconstitutionally discriminated against. Additionally, in considering Indians as a group in and of themselves, has it been shown that there has been a systematic and intentional exclusion of these members because of their race? This court thinks not. The court is familiar with the local practice of jury selection.[1] *246 Voter registration lists have been used in the past few years as a source of new names to supplement the already thousands of qualified jurors who have been chosen from other general sources of names in the years prior to the use of voter registration lists.
Additionally, our local commissioner of jurors has aggressively sought out new jurors by inviting the general public to come in individually and register for jury duty. He has been aided by informative news releases in our local newspapers and on the television. In the lobby of our court house at each entrance there is information posted requesting interested citizens to register for jury duty.
Once a person comes in to sign up for jury duty, whether it is by selection on the part of the commissioner of jurors or the citizen in response to the commissioner’s advertising program, an information card is completed as to various points of information, but no where on such card does it indicate one’s race or color. Having qualified by age, residency, etc. a computer card is completed and placed in the county computer.
Thus, under the system no one at anytime knows if the person who filled out the card is an Indian, White or Black, because the card that is ultimately placed in the computer does not designate such, and because the questionnaire card is not concerned with this factor.
No one can honestly say that there are no Indians on the list from which our jurors are chosen. The actual selection process is quite simple and is done in such a way that discrimination is impossible.
A Judge will go to the computer room on a given day and pick one number from a scale of 1 to 10. For example if number 10 is chosen, every 10th card will be kicked out from the master list until the desired number of jurors is chosen. All this is done by the computer, and once chosen one still does not know the race or color of the individual selected.
The Indians of this county have not been the object of any systematic, intentional discrimination. Voter registration lists are used and Indians may vote or at least register to vote in order to avail themselves of the opportunity to be picked as jurors. If this is not a desirous means of getting on the list, they, as well as all others in the community may respond voluntarily to this county’s commissioner of jurors to sign up for jury duty on their own. Additionally, thousands more have *247 been previously qualified as jurors as a result of the use of other general sources of names.
As the court in Akins v Texas (325 US 398, 400) states: "The Fourteenth Amendment forbids any discrimination against a race in the selection of a grand jury * * * The burden is, of course, upon the defendant to establish the discrimination.”
This the defendant has failed to do.
Point VI
The defendant further contends the instant grand jury was prejudiced by adverse publicity given to this incident in the local press and news media.
The defendant has not shown to this court that any news coverage of the events involved in this case was prejudicial so as to make the Grand Jury biased and prejudiced against this defendant.
The defendant merely alleges in a conclusory way that prejudice and bias is present without any factual support therefor, and without any specific reference to particular news articles upon which a logical inference of such prejudice could be drawn.
The court in People v Broady (195 Misc 349, 350) stated: "That newspaper comment even though extensive does not establish inability to get a fair trial.”
The court in People ex rel. Rohrlich v Follette (55 Misc 2d 201, 204) commenting on the now famous case of Sheppard v Maxwell (384 US 333) "The relator, to prevail, must establish that the facts and circumstances attendant upon the pretrial publicity come within the criteria promulgated by the United States Supreme Court in Sheppard v Maxwell [supra], * * * i.e. that the attendant publicity was so inescapably and inexorably prejudicial as to militate against his being accorded a fair trial * * * Upon the presentation made, petitioner fails to demonstrate actual prejudice; nor can prejudice be presumed from these articles.”
The New York Court of Appeals in People v DiPiazza (24 NY2d 342), while citing Justice Holmes’ observation in Holt v United States (218 US 245) stated that his comment is even more relevant and apt today than when he made it (Holt v United States, supra, p 251): "If the mere opportunity for prejudice or corruption is to raise a presumption that they *248 exist, it will be hard to maintain a jury trial under conditions of the present day.”
This comment by Justice Holmes is substantiated in the case of United States v Anzelmo (319 F Supp 1106, 1113) wherein the court in specifically commenting on cases that have dealt with grand jury bias due to pretrial publicity stated: "Rather than holding that preindictment publicity is inherently prejudicial and cause for dismissal of the indictment, [the cases] have held that the defendant must show specifically that such publicity caused prejudice and bias in the grand jurors and that the indictment returned was the result of essential unfairness.” (Numerous cases cited.)
The court in Anzelmo (supra) also cited Martin v Beto, (397 F2d 741) and the concurring opinion of Judge Thornberry who suggests a contrary view that the inherently prejudicial rule adopted by the courts in Estes v Texas (381 US 532) and Sheppard v Maxwell (384 US 333) for "intense publicity at the trial stage should also be adopted at the grand jury stage” (United States v Anzelmo, supra, p 1114).
The reason for these two different points of view results from what the court states is the "lingering doubt whether one is entitled to an impartial grand jury”, and goes on to cite United States v Knowles (147 F Supp 19, 21) and quotes of that opinion which states: "The basic theory of the functions of a grand jury does not require that grand jurors should be impartial and unbiased. In this respect their position is entirely different from that of petit jurors. The Sixth Amendment to the Constitution of the United States expressly provides that the trial jury in a criminal case must be 'impartial’. No such requirement in respect to grand juries is found in the Fifth Amendment, which contains the guaranty against prosecutions for infamous crimes unless on a presentment or indictment of a grand jury.”
This court having considered all the facts of this case cannot say that the defendant has shown that the news coverage of this incident was so inherently prejudicial to this defendant at this stage by prejudicing the Grand Jury, or has it been shown that there was any specific prejudice present.
This court is a firm believer in maximum fairness and impartiality at all steps of a criminal process, including the all important grand jury stage. However, in order to set aside such proceedings alleged bias and prejudice cannot be presumed.
*249 Point VII
The defendant further contends that the instant indictment should be dismissed on the basis that the District Attorney should not have appeared before the Grand Jury, because he had possessed the authority to evict these intruders, but had failed to do so, although duly requested by the Chiefs of the Onondaga Nation.
Under section 8 of the Indian Law: "The county judge of the county in which such lands are situated, upon complaint made to him, of a violation of this section, shall, if he thinks there is reasonable ground therefor, issue a notice directed to the person against whom complaint is made, requiring him to appear before such judge at a time and place therein specified, to answer the complaint.” The section further provides that if the County Judge determines such individuals are to be removed, "issue a warrant to the sheriff * * * commanding him * * * to remove such person.”
Further the section provides that: "The district attorney of any county in which reservation lands are situated, upon the written applicatioti of a majority of the chiefs, councilors or head man of the nation, tribe or band owning and occupying such lands, shall make complaint of any intrusions on such lands, and cause the intruders to be removed.”
Therefore under the statute complaint may be made to the County Judge or request may be made to the District Attorney and he shall make the complaint to the County Judge to cause the intruders to be removed.
The defendant has not shown to this court that he complied with this statute in either of the two manners provided, and specifically he has not shown that the District Attorney of this county was requested by a majority of the Onondaga Chiefs to make a complaint and to obtain the removal of the alleged intruders.
Moreover, under our CPL 190.55 the District Attorney of the county or his assistants must present the evidence to the Grand Jury relating to any alleged crimes committed within this county, and the instant case provides no exception to this long-standing procedure under our law.
Point VIII
The defendant further contends that he is immune from arrest and prosecution because he was acting pursuant to the *250 official mandates of the Onondaga Council of Chiefs to evict intruders upon their land.
The claim of sovereign immunity for the alleged official acts of Indians upon reservation lands within the various States of the country has in the recent past been the fuel for many controversies.
As the court in McClanahan v Arizona State Tax Comm. (411 US 164, 172-173, supra) states: "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. But it is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States * * * [is] an anomalous one and of a complex character * * * They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations: not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations * * *’. United States v Kagama, 118 US, at 381-382.”
However, as stated earlier, modern cases are tending to avoid reliance on platonic notions of Indian sovereignty and are looking instead to applicable treaties and statutes which define the limits of State power.
Furthermore, our Nation’s history has shown and statutes and treaties have all manifested the right of Indians to have the exclusive possession of their reservation lands, and the courts recognize that Indians on the reservations of our States have a semi-independent status, with the right to govern their internal affairs.
However, it is at this point where the conflict arises, having stated that the Indians have a right to govern their internal affairs; is the act of evicting white intruders upon Indian lands an incidental and valid exercise of self-government, or does this conduct go beyond the concept of self-government and into the area that both Congress and the Legislature of the State of New York have pre-empted in order to avoid injury to both property and person? The enactment of the Indian Law provides a means by which intruders may be removed from Indian lands. Thus the Indians in regulating their internal affairs may designate who is an intruder. How *251 ever, they must proceed to remove individuals in accordance and within the framework of our statutory guidelines.
The concept of self-government as in any concept of a free society has its restrictions, and where the Congress or the local State Legislatures have enacted legislation in an area upon the basis that injury to person and property may be avoided, the rights of any individual or group must yield to the welfare of the public as a whole.
Therefore, it is the court’s opinion that the defendant is not immune from prosecution because he was acting pursuant to the official mandates of the Council of Chiefs.
Additionally, a portion of the amicus curiae brief submitted to this court directs its attention to the point of whether this defendant could be considered to be criminally liable for his acts under the facts and circumstances of this case. It contends that whether a criminal intent existed in the mind of a person accused of a crime must of necessity be inferred from the attending circumstances which characterize it.
Therefore, to establish burglary third degree, it must be shown that the defendant knowingly entered or remained unlawfully in a building and that he intended to commit a crime therein. Under the circumstances of this case, including the fact that the defendant was allegedly acting pursuant to a lawful decision of the Onondaga Council of Chiefs, and the fact that the alleged acts occurred on the Indian reservation, the defendant could not have acted with the criminal intent required because he believed his acts to be lawful.
This court believes that the question of the defendant’s mental state or culpability, including the intent and the question of the license or privilege to enter these premises, and all other aspects of his conduct as it relates to the elements of all the crimes charged, are best left to the trial of this case, as matters to be raised by the defense.
It must be remembered that throughout the criminal trial of this matter the defendant is presumed innocent and the burden to prove each and every element of the crimes charged beyond a reasonable doubt is placed upon the District Attorney and the burden never shifts.
In the event the evidence produced at trial negates any of the requisite elements of these crimes then the defendant must be found to be not guilty, but it is not for this court at this stage of the criminal process to decide these issues.
*252 Lastly, the defendant has raised several other points of law upon this motion and the court finds that upon due consideration they are without merit and most certainly do not warrant a dismissal of this indictment.
The defendant’s motion is therefore denied.

. This court, when it became aware that the selection of the general jury pool was to be an issue, contacted by phone the defendant’s attorney. The court advised the defendant’s attorney that it would grant a hearing, with witnesses to be produced to testify as to the selection of the jury pool here in Onondaga County. The defendant’s attorney was to call back within 24 hours if this hearing was necessary. No reply has been received as of this writing and the court makes these findings on its own independent inquiry and its own personal knowledge.