**UNITED STATES of America, Plaintiff,**

**v.**

**Arthur P. TRANAKOS, et al., Defendants.**

**No. CR–83–0013.**

United States District Court, D. Wyoming.

July 28, 1988.

972

Francis Leland Pico, Asst. U.S. Atty., for the Dist. of Wyoming, Cheyenne, Wyo., for plaintiff.

Michael DeGuerin, Houston, Tex., for Tranakos.

Donald I. Schultz, Cheyenne, Wyo., for Pilgrim.

John Pattno, Cheyenne, Wyo., for Perry.

### MEMORANDUM OPINION AND ORDER

ALDON J. ANDERSON, Senior District Judge, Sitting by Designation.

The court heretofore entered its order on the record denying Defendants' Amended Motion to Quash the Indictment, but under 28 U.S.C.A. § 1867(d) granted a stay of further proceedings to allow a resubmission of the matter to a properly drawn Grand Jury. The court has set July 21,

1988, at 9:00 o'clock a.m., for the government to report whether it has been resubmitted and what further or other proceedings need to be undertaken.

The court stated on the record its findings and conclusions in support of the order requiring resubmission. However, because of the importance of the matter the court will give the background facts and its reasons for the order.

The Defendants' original Motion to Quash the Indictment was heard by U.S. District Judge John S. Kane, Jr., of the District of Colorado.[1] In it the defendants claimed the grand jury that charged them was selected under a plan that was in violation of the Sixth Amendment and the Federal Grand Jury Selection and Service Act of 1968. Defendants also raised other grounds, including a claim that the indictment should be dismissed because of governmental misconduct. The judge ordered a dismissal on the basis of governmental misconduct, but denied the other claims. Defendants had argued the Wyoming Plan's wholesale exclusion of persons in 19 counties violated the Sixth Amendment and the "fair cross-section" policy required by the act. *See* 28 U.S.C. § 1861. Judge Kane rejected this claim, noting the act required a fair cross-section only "in the district or division where the court convenes," and that the claim of a higher percentage of government employees in the division did not establish that the grand jury was somehow biased. Nor did the facts show that the population of the 19 counties of the state, outside the four in the Cheyenne division, were a distinct or cognizable group within the meaning of the doctrine in *U.S. v. Test,* 550 F.2d 577, 594 (10th Cir.1976). Judge Kane in his opinion later said:

Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or under represented by reason of such imbalance, does not violate the statutory ad constitutional requirement that the jury represent a little

1. *U.S. v. Anderson,* 577 F.Supp. 223 (D.Wyo. 1983).

'cross-section of the community'. 577 F.Supp. at page 228.

The ruling was appealed to the Court of Appeals for the Tenth Circuit, 778 F.2d 602. The court reversed the order of dismissal on government misconduct, but left untouched Judge Kane's ruling denying that the Wyoming plan for random selection of the jury was in violation of the Sixth Amendment and the Federal Grand Jury Selection and Service Act of 1968. The reasoning employed in this ruling is of importance in considering a similar focus of attack defendants have mounted in the Amended Motion to Quash.

After the Tenth Circuit's remand to the Wyoming District Court, Judge Alan B. Johnson[2] allowed the filing of the Amended Motion to Quash claiming an "identifiable and cognizable group" (referred to by Judge Kane, with the cases he cited) was systematically excluded from grand jury service by the District of Wyoming jury plan. Defendants added to the claims that persons for the grand jury were selected only from the four counties of the Cheyenne Division. They have identified Native Americans of the Shoshone and Arapaho tribes as being the "cognizable group" left out, despoiling the "fair cross-section" selection mandated by law. At the hearing before Judge Johnson evidence was introduced to show that the Shoshone and Arapaho Indians lived on the Wind River Reservation (in the Lander Division). The reservation was outside the geographical area from which all grand jurors have been summoned. Judge Johnson recused himself, however, without ruling on the Amended Motion to Quash the Indictment.[3]

The Wyoming plan for the selection of grand and petit juries was expanded and set out in Judge Kane's "Memorandum Opinion and Order" (577 F.Supp. at 226, 228) and was made a part of defendants' Motion by incorporation and reference. It

is quoted here because of its importance in understanding the issues presented by the Amended Motion to Quash filed in this case.

In response to the Act of 1968, the district court formulated a plan for the random selection of grand and petit jurors. The plan was approved by the 10th Circuit Judicial Council on September 18, 1968. The plan divided the state and district into five divisions for jury selection purposes, Cheyenne, Casper, Sheridan, Evanston and Lander, after the five principal cities in those divisions. As originally passed, grand jurors were randomly selected from the qualified jury wheels of each of the divisions and placed into a pool, from which the grand jury was selected.

By order of April 30, 1986, the plan was modified to read:

In order to ensure the more efficient and regular use of the grand jury, and to ensure that grand juries may be summoned at such times as the public interest requires without delay, unnecessary expenses or undue burden upon the citizens of the district, which delay, expense and burden necessarily result because of the great distances between cities within the district, and because all criminal trials are conducted at Cheyenne,[4] the selection of jurors for the grand jury shall be taken at random from the Qualified Jury Wheel of the aforesaid Cheyenne Division of the district. The persons so chosen shall then be summoned as hereinbefore provided and shall constitute the grand jury array from which the grand jury shall be selected.

The plan also provides in the next paragraph:

Should it become necessary or desirable to conduct a criminal trial at a place of holding court other than Cheyenne which

**2.** Judge Johnson, at that time a newly appointed judge for the District of Wyoming, was assigned the case on remand to the district court.

**3.** The undersigned judge was assigned the case after Judge Sam A. Crow of the U.S. District of Kansas, found he was unable to continue with

it. He had been assigned after Judge Johnson's recusal.

**4.** The Circuit Judicial Council in approving the plan eliminated the phrase "... because all criminal trials are conducted at Cheyenne ...".

necessitates indictment proceedings, the same procedure above will be followed for whatever jury division is involved.

The original plan as well as all subsequent modifications and amendments have been approved by the Judicial Council of the Tenth Circuit Court of Appeals. The records of the United States District Court for the District of Wyoming show that American Indians living on the Wind River Indian Reservation are and have been included in the pool from which grand jurors and trial jurors may be selected for the Lander Division of the United States District Court for the District of Wyoming. But it was stipulated before Judge Kane, and is still true here, that no grand jurors have been drawn from the Lander Division, or any other division.

It is argued by defendants that the plan excludes a "cognizable group," Native Americans from the Shoshone and Arapaho tribes, from federal grand juries because they live outside the area from which all grand jurors are selected; that they are a distinct group, and without them being considered there could not be a fair cross-section.

The government claims practical support in the fact that, as shown by the jury selection plan as modified on April 30, 1976, and March 17, 1981, the order selecting grand jurors from the Cheyenne Division in the District of Wyoming was appropriate to avoid delays, unnecessary expense and undue burden upon the citizens of the district which would result because of the great distances between cities. However, in the event it became necessary or desirable to conduct criminal trials or indictment proceedings in other divisions, then the plan permits the grand jury to be selected from the qualified jurors in those divisions. The government argues that this proviso makes the plan flexible and constitutional.

The government also claimed that the defendants had no substantiation for the claim that there had been a "systematic" exclusion of Native Americans from federal grand juries. The Clerk of Court's affidavit was relied upon to show that Native Americans have been included in the pool from which grand jurors and trial jurors could be selected.

The government in a supplemental brief cites *State ex rel. Busch v. Tahash,* 281 Minn. 244, 161 N.W.2d 326 (1968), holding that "... the fact that a definable class of persons represented a higher proportion of the population as a whole than it did of those qualified to vote did not invalidate the system of selection."

Also, the government notes that the Supreme Court of Nebraska, *State v. Wright,* 196 Neb. 377, 243 N.W.2d 66 (1976), upheld the constitutionality of the jury where the attack on the jury panel was not supported by the evidence with respect to the number of Indians in the county registered to vote, or any evidence Indians were an identifiable group.

Finally, plaintiff relies on *People v. Cook,* 81 Misc.2d 235, 365 N.Y.S.2d 611 (1975), in which an Indian defendant challenged the selection process used for the Grand Jury. The Court upheld the use of voter registration lists as source of jurors for selecting members of the Grand Jury. The government notes the draw is random from voter registration lists. This court believes that defendants do not challenge the fact that voter registration lists do "produce a generally representative cross-section of the community."

In the court's view, the government's cases are too general to be of help. The problem here is more specific and requires consideration of certain provisions of the Federal Jury Selection and Service Act of 1968. The language of 28 U.S.C. § 1861 makes plain that the selection of grand and petit juries must be from a "fair cross section of the district or division," and that it is the policy of the United States that all citizens shall have the opportunity for such service and be obligated to respond.

In *U.S. v. Yazzie,* 660 F.2d 422, 425 (10th Cir.1981), the court quoted from *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979):

... the defendant must show (1) that the group [alleged to be excluded] is a 'distinctive' group in the community; (2) that

the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

The Yazzie court states that in assessing whether a given defendant's constitutional or statutory rights have been violated through the operation of a jury selection process, the proper focus of inquiry must be the impact of the challenged process on the grand and petit juries. This assessment must be made in light of the well-settled rule that a defendant has no right to a grand or petit jury of any given demographic composition, but only to jury panels selected from a source "reasonably representative" of the community.

Helpful here is a quote from *Hernandez v. Texas*, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1953):

> [O]ther differences from the community norm may define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.

In the case at hand we have a question of fact as to whether there is a cognizable group that is excluded in a manner that violates the requirement of a "fair cross-section" called for by the law.

The decisional law requires the movant to present facts persuasive that there is a cognizable group having an underrepresentation in the group from which grand juries are selected under circumstances that despoil a chance of there being a fair cross-section. If there be such an underrepresentation it must be due to systematic exclusion.

In the case of *U.S. v. Marrapese*, 610 F.Supp. 991 (D.R.I.1985), the court said:

> The Supreme Court long ago pinpointed the constitutional values which are damaged when a cognizable group is excluded from the jury selection modality, including potential prejudice against the defendant and stigmatization of the group excluded from service. *Strauder v. West Virginia*, 100 Otto 303, 308–09, 25 L.Ed. 664 (1880). Such considerations remain current. "Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well." *Peters v. Kiff*, 407 U.S. 493 at 502–03, 92 S.Ct. 2163 at 2168, 2169, 33 L.Ed.2d 83 (1972).

> To determine whether a group is "cognizable" or "distinctive," a court must examine factors such as adequacy of definition, degree of cohesiveness, and the potential for prejudice (i.e., whether the exclusion of the group might cause juries to be biased against a defendant from that group or, on the other and, might foster stigmatization of the group itself). *Barber v. Ponte*, [772 F.2d 982, 986 (1st Cir.1985)]; *Willis v. Zant*, 720 F.2d 1212, 1216 (11th Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed. 849 (1984); *United States v. Test*, 550 F.2d 577, 584 (10th Cir.1976). On all three of these criteria, the defendants' attempted identification of "professionals" as a cognizable group is doomed to certain failure.

The factors set out in the case must be supported by the evidence and considered in deciding whether a group is "cognizable" or "distinctive."

The facts in *Marrapese* are substantially less persuasive than here, since the claim of underrepresentation had to do with an alleged group of "professionals" as being underrepresented, which the court said was "nearly impossible to define." *U.S. v. Marrapese, supra*, 610 F.Supp. at 1003.

In *U.S. v. Smith*, 463 F.Supp. 680 (E.D. Wisc.1970), the court spoke of American Indians as a "cognizable group," as having some quality or attribute which defines or limits it. However, the court felt that the evidence there didn't sufficiently show a

cohesiveness of attitudes, ideas, or experience that set them apart from other persons, and hence did not discriminate against them.

While these cases speak with respect for the principles involved, few challenges have succeeded. Generally the population mix presents such variety that the elements essential to "cognizable group" and "fair cross-section" are very difficult to identify and establish. However, in the case at hand it appears to the court there is substantial evidence as to the "cohesiveness," uniqueness of culture and ideas that are factors in determining "fair cross-section."

To provide these facts the defendants called defendant Tranakos to testify at the hearing on the Amended Motion to Quash. He testified of census statistics bearing on the issues, with no objections of consequence. Quoting from the 1980 Census for Wyoming, he testified that there were 7,057 Indians in Wyoming, with approximately 92 percent of them living outside of the Cheyenne Division, and only 650 in the Cheyenne Division of four counties. John Washakie, the Chairman of the Business Council of the Shoshone, and a descendant of fabled Shoshone leader Chief Washakie, said that only four Shoshone lived in the four counties of the Cheyenne Division. He said 2,463 lived on the Wind River Reservation or in or near Lander. There are approximately 4,000 Arapaho that live on the reservation or in or near Lander or Thermopolis, and in the Lander Division.

John Washakie said that no Arapaho or Shoshone had ever served on a grand jury in his recollection of seven and one-half years in active leadership (two years as chairman of the Business Council), although a number of tribal members had been charged for crimes by the Cheyenne grand jury. In addition to his own memory, he referenced having been so advised by the investigator for the B.I.A. (Bureau of Indian Affairs, Rich Ferris).

He spoke sincerely of the desire of his people to have the opportunity to be considered for grand jury service and of their increasing interest in voting and in education.

He testified of the establishment of the two tribes on the Wind River Reservation—how they held joint councils on matters affecting both tribes, but otherwise were governed by separate Business Councils, and had their separate treaties.

It was apparent that the Shoshone and Arapaho have their own unique and individualistic religious practices and principles. They still try to hold their sun dances and sweat lodges. They honor their elders and care for them. They strive to preserve their language and traditions. They hold classes in their language and history through stories and customs to preserve their heritage.

He told of their interest in farming and agriculture, to live close to nature. He explained how they had to file lawsuits to protect their rights and way of life when infringed upon by the government and others.

He told of their living conditions and the extent to which they have interfaced with the white man's world and kept a cultural identity unique as to themselves.

He testified of the essential cohesiveness of the tribe as a community and of the close association with them of the Arapaho. Long ago the Shoshone allowed them to live on their land because of their dire need. They have since been granted the right to own part of the reservation as their own.

Mr. Washakie was a well-dressed, handsome man. He was soft-spoken, but proud and concerned. The court believes Shoshone and Arapaho are a "cognizable group," with a unique culture, customs, and ideas that have worth and value to the rest of the citizens of the state, white or other color, with whom they interface.

Had the government called a grand jury from time to time in the Lander Division, it may have met constitutional and statutory standards. But in view of the fact that the Shoshone and Arapaho are manifestly a cognizable group, with unique ideas, values, customs and culture, they cannot be

left out of the grand jury draw without loss to the community. Consequently, the application of the Wyoming plan results in a failure to draw the grand jury from a "fair cross-section of the community," contrary to the requirements of 28 U.S.C. 1861 and the Sixth Amendment.

Based on the foregoing facts and conclusions of law to be drawn therefrom, the court heretofore entered its order under 28 U.S.C. § 1867 staying the action to allow the government to resubmit the indictment to a proper grand jury, or face a dismissal, or take an appeal of the court's order.