**UNITED STATES of America,**
**Plaintiff,**

v.

**Scott CONANT and Beth**
**Conant, Defendants.**

**United States of America, Plaintiff,**

v.

**Steven R. Imig, Defendant.**

**Nos. 99–CR–153, 99–CR–156.**

United States District Court,
E.D. Wisconsin.

Sept. 21, 2000.

Melvin K. Washington, Assistant U.S. Attorney, Milwaukee, WI, Daniel H. Sanders, Assistant U.S. Attorney, for United States.

Dennis P. Coffey, Cook & Frar, for Scott Conant.

Michael J. Fitzgerald, Glynn, Fitzgerald and Albee, for Beth Conant.

Robert J. Dvorak, for Steven Imig.

## ORDER

STADTMUELLER, Chief Judge.

This matter comes before the court on defendants' joint motions to strike the petit jury pool and to stay further proceedings. Because the court finds the jury pool to be free from statutory or constitutional infirmities, the court will deny defendants' motions.

## FACTS

By its Plan for the Random Selection of Grand and Petit Jurors (as amended in 1985) ["the Plan"], the court, the Seventh Circuit Judicial Council approving, split the federal judicial district for the Eastern District of Wisconsin into two divisions: the Milwaukee Division, consisting of the southernmost seven counties in the district,[1] and the Green Bay Division, encompassing the remaining twenty-one counties in the district.[2] While efforts have long existed to appoint a district court judge for the Green Bay Division, at present all district court judges in the Eastern District of Wisconsin sit in the federal courthouse in Milwaukee. Consistent with the Plan, jurors for trials to be held in Milwaukee are drawn from the Milwaukee Division. As a consequence, Green Bay Division residents have had little opportunity to serve as jurors. In fact, Green Bay Division residents have formed only one federal petit jury since 1981.

On August 3, 1999, a federal grand jury sitting in the Eastern District of Wisconsin returned a nine-count indictment against Scott Conant and Elizabeth Conant. Counts one through seven charge Scott Conant with obtaining controlled substances by misrepresentation, fraud, deception and subterfuge, contrary to 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2; count eight charges Scott and Elizabeth Conant with obtaining controlled substances by misrepresentation, fraud, deception and subterfuge, contrary to 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2; and count nine charges Elizabeth Conant with obtaining controlled substances by misrepresentation, fraud, deception and subterfuge, contrary to 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2. Scott and Elizabeth Conant were arraigned on August 13, 1999, before

1. Specifically, the Milwaukee Division consists of Kenosha, Milwaukee, Ozaukee, Racine, Walworth, Washington, and Waukesha Counties.

2. The Green Bay Division includes Brown, Calumet, Dodge, Door, Florence, Fond du Lac, Forest, Green Lake, Kewaunee, Langlade, Manitowoc, Marinette, Marquette, Menominee, Oconto, Outagamie, Shawano, Sheboygan, Waupaca, Waushara, and Winnebago Counties.

the Honorable William E. Callahan, Jr., and pled not guilty. United States Magistrate Judge Aaron E. Goodstein was assigned for all pretrial processing.

On September 19, 1999, the Conants moved to strike the petit jury pool and stay further proceedings. They contended that, because the pool from which petit juries are chosen in the Eastern District of Wisconsin does not as a practical matter include any residents of the Green Bay Division, the system violates the Fifth and Sixth Amendments to the United States Constitution, the Jury Selection and Service Act of 1968, and the Plan of the United States District Court for the Eastern District of Wisconsin for the Random Selection of Grand and Petit Jurors.

On October 29, 1999, in the cases of *United States v. Kostan,* Case No. 99–CR–136, and *United States v. Imig,* Case No. 99–CR–156, the Honorable Patricia J. Gorence granted defendants' motions to consolidate their respective motions to strike the petit jury pool with the Conants' motion to strike. The motions in those cases are identical with the motions filed by the Conants. The *Conant* and *Imig* cases have been assigned to this court for trial, while the *Kostan* case has been assigned to Judge Charles N. Clevert. In view of the pending motions, all trial dates in these cases have been held in abeyance pending a decision on the defendants' motions to strike the jury pool.

On November 18, 1999, Magistrate Judge Goodstein held an evidentiary hearing regarding the defendants' motions. The court's findings of fact are contained in Magistrate Judge Goodstein's June 21, 2000 Recommendation to Chief Judge J.P. Stadtmueller and to the Honorable Charles N. Clevert. Several of the court's findings are important, and will be repeated here.

According to the 1990 census, the Eastern District of Wisconsin is composed of approximately 2.2 million voting-age residents; 1.3 million (61%) of whom live in the Milwaukee Division and 838,000 (39%) of whom reside in the Green Bay Division. Elizabeth and Scott Conant are Green Bay Division residents, as is Steven Imig.

Defendants' expert, Dr. Gary Sandefur of the University of Wisconsin–Madison, testified that, in his opinion, significant differences exist between the Milwaukee and Green Bay Divisions of the Eastern District of Wisconsin. Most importantly, the 1990 census indicates that 43.2% of Green Bay Division residents live in rural areas, while only 13.8% of Milwaukee Division residents reside in such areas.[3] By the same token, 5.5% of Green Bay Division residents are engaged in farming, while the corresponding number for the Milwaukee Division is 1%. However, Dr. Sandefur also testified that there is no evidence to suggest rural residents of the Green Bay Division do not share the same characteristics as rural residents of the Milwaukee Division. Furthermore, when specifically asked to do so, he was unable to identify characteristics that might distinguish Green Bay Division residents from their Milwaukee counterparts or define the group as a community of interest.

After reviewing the facts and the law, on June 21, 2000, Magistrate Judge Goodstein recommended that the defendants' motions to strike the petit jury pool and to stay the case be denied. On July 5, 2000, the defendants timely objected to Magistrate Judge Goodstein's recommendation. The issues have been fully briefed and are ready for resolution by the court.

## DISCUSSION

Defendants make two primary arguments in this case: that the jury selection procedure employed by the United States District Court for the Eastern District of Wisconsin violates the equal protection component of the Fifth Amendment, and that the plan denies them a jury drawn from a fair cross section of the community, as guaranteed by both the Sixth Amend-

---

**3.** The court notes that this statistic, and those that follow, is based on the Green Bay and Milwaukee Divisions' population as a whole, and is not confined to voting-age residents.

ment and the Jury Service and Selection Act of 1968. Each argument will be addressed in turn.

## A. Equal Protection

Defendants in this case contend that eligibility for jury service is a fundamental right of American citizens, and that the court denies Green Bay Division residents equal protection of the laws by including them in few, if any, jury venires.

By 1880, the United States Supreme Court established that jury service may implicate fundamental equal protection concerns. *See, e.g., Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879). In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Court created guidelines for scrutinizing government enactments allegedly violative of the equal protection guarantees of the United States Constitution. The principles of equal protection analysis enunciated in *Rodriguez* require the reviewing court initially to determine whether the accused system discriminates against a suspect class (one that has been a traditional or perennial victim of discrimination, or politically powerless) or "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Rodriguez,* 411 U.S. at 17, 93 S.Ct. 1278. If the classification in question discriminates against a suspect class or impinges upon a fundamental right, it is constitutionally sufficient only if a "compelling state interest" justifies the existence of the classification. If, on the other hand, the scheme is not directed against a suspect class and does not impinge upon a fundamental constitutional right, it must be upheld if "it rationally furthers some legitimate, articulated state purpose." *Id.*

Here, the defendants do not contend—nor could they—that the jury selection procedure followed by the court discrimi-

nates against a suspect class. The "class" of people involved are the multitudinous and heterogenous residents of twenty-one separate counties, after all. The defendants do claim, however, that a fundamental constitutional right is at stake—the right to serve on a jury.

No court that has considered the question of whether being eligible for jury service is a constitutional right has answered in the affirmative. *See Eckstein v. Kirby,* 452 F.Supp. 1235, 1241 (E.D.Ar.1978) ("This court ... holds that the plaintiff's interest in serving as a juror ... is not a 'fundamental right' explicitly or implicitly protected by the United States Constitution"); *Adams v. Superior Court of San Diego Cty.,* 12 Cal.3d 55, 115 Cal.Rptr. 247, 524 P.2d 375, 380 (1974) ("an individual's interest in serving on a jury cannot be held a fundamental right"). The defendants point the court to *United States v. Cannady,* 54 F.3d 544, 548 (9th Cir.1995), however, which suggests the existence of a "constitutional right ... to be included in the jury selection plan of a district or division." While the court passes no judgement on the validity of the Ninth Circuit's assertion,[4] it is worth noting that the passage does *not* create the right to serve as a juror; it merely articulates a right to be included in a jury plan. As such, it does little to further defendants' argument since Green Bay Division residents *are* included in a jury plan. Indeed, they have been included in previous juries (although few), and undoubtedly will serve regularly as jurors as soon as Congress approves the creation of a federal district judgeship for the Green Bay Division of the Eastern District of Wisconsin. *Cannady* does not contradict *Eckstein* or *Adams, supra.*

While no court has yet recognized a constitutional right to serve on a jury, the possibility that such a right might exist is to be given the most careful consideration.

---

4. The court does note that the statement was dicta unnecessary for resolving the question then at issue—whether a particular judicial district's jury selection plan violated the fair

cross section requirement of the Sixth Amendment—and is unsupported by the caselaw there cited (*United States v. Herbert,* 698 F.2d 981, 984 (9th Cir.1983)).

Jury service is one of the most prized "privilege[s] of citizenship[.]" *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 224, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). It is "an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life." *Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). "The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system." *Id.* at 406, 111 S.Ct. 1364 (citing *Duncan v. Louisiana,* 391 U.S. 145, 147–58, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Id.* at 407, 111 S.Ct. 1364. "Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

■ The undoubted importance of jury service in the administration of justice in America does not necessarily mean that such service is a fundamental right, however. *See Rodriguez,* 411 U.S. at 32, 93 S.Ct. 1278 ("... social importance is not the critical determinant for subjecting [matters] to strict scrutiny"). "[T]he key to discovering whether [a purported right] is 'fundamental' is not to be found in compar-isons of ... relative societal importance.... Rather, the answer lies in assessing whether there is a right to [serving on a jury] explicitly or implicitly guaranteed by the Constitution." *Id.* at 33, 93 S.Ct. 1278.

■ The right to serve on a jury, of course, is not among the rights afforded explicit protection under our federal constitution.[5] To determine whether such a right is implicit in the constitution, the court must look to see if the asserted right is objectively "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934)), and " 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [it] were sacrificed.' " *Id.* (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937)).[6] Thus, the court must look to the history and traditions of the nation.

The defendants would have the court imply an historical pedigree for the right to serve on a jury from the perhaps related pedigree of jury trials in general, which stretches back to the Magna Carta, if not further. According to the defendants, "If the federal government must provide juries as a constitutional necessity, as it must, then jurors and jury service too are constitutional necessities. The one cannot occur without the others." Defendants' Objections to June 21, 2000 Recommenda-

---

**5.** While defendants are quite right in pointing out that the Constitution of the United States mentions "juries" in three separate places, at no point is a citizen's purported right to serve on a jury discussed. Article III, Section 2, states that trial of all crimes, except in cases of impeachment, shall be by jury. The Sixth Amendment guarantees the accused in all criminal trials the right to "an impartial jury of the State and district wherein the crime shall have been committed," and the Seventh Amendment states that in suits at common law, the right of trial by jury shall be preserved, and no fact tried by the jury shall be otherwise re-examined except in accordance with the rules of common law.

**6.** The Court notes that while *Glucksberg* was considered a "substantive due process" case, fundamental rights analysis is the same, whether phrased in equal protection terms or substantive due process terms. *Cf. Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258 (supporting "substantive due process" analysis by citation to *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), an equal protection-type fundamental rights case that employed a similar analysis).

tion, at 21. While true, this argument does not prove the specific point: The mere existence of juries does not in any way suggest that everyone has a right to serve on such juries.

The defendants would next have the court imply an historical basis for the right to serve on a jury from the many cases that state one cannot be excluded from a jury due to one's gender or ethnicity. *See, e.g., Carter v. Jury Comm'n. of Greene Cty.*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). The *Carter* decision, like all others cited by the defendants, however, is agnostic on the issue of whether there exists a right to serve on a jury. What the Supreme Court actually said in that case is, "Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise." *Carter*, 396 U.S. at 330, 90 S.Ct. 518. While the Court acknowledged a right not to be discriminated against on racial grounds, nowhere did it opine that the state must extend the privilege of jury service to all citizens. One cannot construct an historical foundation from such flimsy building material.

Finally, the defendants would have the court find an historical basis for the right to serve on a jury from analogy to the right to vote. The Supreme Court, in *Rodriguez*, specifically warned against finding constitutional rights by implication from other rights, however. *See Rodriguez*, 411 U.S. at 33, 93 S.Ct. 1278.

When one looks at the history and traditions of the United States objectively, one sees an unfortunate, but long, history of citizens being excluded from jury service due to the happenstance of residence. *United States v. Herbert*, 698 F.2d 981 (9th Cir.1983), and *United States v. Footracer*, 189 F.3d 1058 (9th Cir.1999), for example, describe residents of the District of Arizona being excluded from jury service because they do not live close enough to the court where the judges of that district sit.

*United States v. Gottfried*, 165 F.2d 360 (2nd Cir.1948), discusses certain residents of the Southern District of New York being excluded from jury service for the same reason. Neither these cases, nor any others the court is aware of, suggest that a fundamental right has been impinged in the process.

■ While the court agrees with defendants that jury service is a "badge of citizenship" worn proudly by all those who have the opportunity to do so and that it would, indeed, be desirable for all citizens to have that opportunity, the court is unwilling to go the next step and to proclaim the opportunity to serve on a jury to be a fundamental right. As the United States Supreme Court explained in *Washington v. Glucksberg*, "we have always been reluctant to expand the concept of [fundamental rights] because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the area of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the [Fifth Amendment] be subtly transformed into the policy preferences of the members of this Court.' " *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258 (internal quotes and citations omitted).

■ As the defendants have failed to show that the right to serve on a jury is either explicit or implicit in the United States Constitution, the test to be applied by the court in analyzing any procedure that affects that "right" is mere rational basis scrutiny. *See Rodriguez*, 411 U.S. at 17, 93 S.Ct. 1278. If there exists a rational relationship between the disparity of treatment and some legitimate government purpose, the accused procedure does not violate the equal protection guarantees of the constitution. *See id.*

The government asserts that the Eastern District of Wisconsin's petit jury selection process excludes Green Bay Division residents because the district has not received funding to operate a court in the Green Bay Division. Therefore, to secure Green Bay Division residents on the jury venire, the district court must either incur the cost and inconvenience of securing space and moving court personnel to the Green Bay Division or incur the cost and inconvenience attendant to having Green Bay Division residents come to Milwaukee for the purpose of jury service.

It is fair to say that all parties—the defendants, the government, and the court—concur that the current system for selecting jurors in this district is not ideal. However, "the purpose behind a government enactment need not be laudatory—to pass constitutional muster, the purpose must simply be legitimate." *Evans v. City of Chicago*, 873 F.2d 1007, 1016 (7th Cir.1989). "If the court can hypothesize plausible reasons for legislation that are within the legitimate goals of a government, nothing else is required to validate the governmental classification[.]" *Id.* Here, the court concludes that logistical problems and cost involved with either taking the court to Green Bay, or in requiring Green Bay Division residents to come to Milwaukee for petit jury service, are legitimate bases for the decision to limit federal petit jurors in the Eastern District of Wisconsin to residents of the Milwaukee Division. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 115, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (administrative convenience meets rational basis test). Therefore, the court concludes that the Eastern District of Wisconsin's method for selecting jurors does not violate the Fifth Amendment's guarantee of equal protection.

## B. FAIR CROSS SECTION

The defendants next contend that the Eastern District of Wisconsin's method for selecting petit jurors violates their Sixth Amendment right to a jury that represents a fair cross-section of the community.[7] In addition, the defendants submit that this district's method for selecting jurors violates the Jury Selection and Service Act of 1968 ["JSSA"]. The court notes that the inquiry for evaluating a claim under the Sixth Amendment is identical to the inquiry for evaluating a claim under the Jury Selection and Service Act. *See United States v. Raszkiewicz*, 169 F.3d 459, 462 n. 1 (7th Cir.1999).

In order to show a prima facie violation of the fair cross-section requirement, the defendants must establish: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that representation of this group on jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is caused by systematic exclusion of the group in the jury-selection process. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). If the defendants establish these elements, then the burden shifts to the government to show that those aspects of the jury selection process that result in disproportionately excluding a distinctive group manifestly advance an overriding, significant government interest. *See Raszkiewicz*, 169 F.3d at 463.

7. The cross section requirement is not explicitly included in the language of the Sixth Amendment, which only requires that all juries in criminal cases be "impartial." Nonetheless, it is established that an essential characteristic of an impartial jury is that the jury be drawn from a fair cross section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 526–31, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Congress has legislatively mandated the same requirement in the Jury Selection and Service Act of 1968, currently codified in 28 U.S.C. § 1861, which provides, in part: "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."

The defendants argue that the sheer size of the Green Bay Division—approximately 40 percent of the Eastern District of Wisconsin's voting-age citizenry—makes it a distinct group for purposes of the fair cross-section requirement. In addition, they argue that the more rural qualities of the Green Bay Division mark its people as distinct from residents of the Milwaukee Division. The court understands these as being separate arguments, and will address each in turn.

In *Raszkiewicz*, the Seventh Circuit Court of Appeals adopted criteria for determining group distinctiveness, the elements of which are (1) the existence of qualities that define a group; (2) similarity of attitudes, beliefs, or experiences; and (3) a community of interest among group members. 169 F.3d at 459. Defendants' expert, Dr. Gary Sandefur, testified that he was unable to identify characteristics that would distinguish Green Bay Division residents from their Milwaukee Division counterparts or define them as a community of interest. However, the *Raszkiewicz* court stressed that the test "is not to be applied mechanistically but must be used with common sense in light of the main purpose of the fair cross-section requirement to provide an impartial jury." *Id.* The defendants urge this court to focus on the Seventh Circuit's admonition not to apply the three-factor test mechanistically and to conclude that the sheer size of the excluded group in this case—the entire Green Bay Division—ensures that it is a distinct group for fair cross-section purposes. The defendants compare Green Bay Division residents to other large groups—such as women, African-Americans and Hispanics—who do not necessarily share a similarity of attitudes or community of interest but have nonetheless been found to be distinct groups.

The defendants' position does find some support in the case law. In reaffirming the right of defendants to challenge the

exclusion of African–Americans from their juries in *Peters v. Kiff,* 407 U.S. 493, 503–504, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), the Supreme Court wrote, "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." Several years earlier, the Court stated, "This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups in the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Thiel v. Southern Pac. Co.,* 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946).

As the Court itself noted in 1990, however, "the only groups the Court has recognized as distinctive thus far have been women and certain racial groups." *Holland v. Illinois,* 493 U.S. 474, 485, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). Indeed, every court that has looked at the question of whether the residents of a geographic area may constitute a "distinctive" group for Sixth Amendment purposes solely due to the location of their residence has answered negatively.

Facing the exact question in *United States v. Gottfried,* 165 F.2d 360, 364 (2nd Cir.1948),[8] Judge Learned Hand proclaimed, "It has indeed been stated that jurors must be drafted 'without systematic and intentional exclusion' of any 'geo-

---

8. In *Gottfried,* a defendant challenged the practice of the federal district court for the Southern District of New York of only draw-

ing jurors from the Counties of Westchester, Bronx, and New York, completely excluding the other residents of the district.

graphical,' as well as of any 'social, religious, racial' or 'political' group; and that may well forbid the officials who draw up the lists from excluding any part of the district at their own choice. We assume that they may not do so; but if they do not, 'geographical' uniformity is satisfied, for the district and circuit courts have had power since the first Judiciary Act of 1789 to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity."

Subsequent judges have echoed Judge Hand. Also facing a situation wherein residents of one division of a federal judicial district were ineligible for jury service, the Ninth Circuit Court of Appeals recently wrote, "It seems clear that the population residing within the Prescott Division's large geographic area lack sufficient shared attitudes, ideas and experiences to qualify as a 'distinctive' group." *United States v. Footracer,* 189 F.3d 1058, 1064 (9th Cir.1999). Numerous courts have made similar rulings. *See Zicarelli v. Dietz,* 633 F.2d 312, 320 (3rd Cir.1980) (residents of a geographic group cannot be considered a distinctive group for cross-section analysis unless the group is "profoundly culturally distinct"); *United States v. Butera,* 420 F.2d 564, 572 (1st Cir.1970) ("We are not aware that residents of counties can be said to hold views and attitudes which are in any way 'distinct' from those of their neighbors"); *Cobbs v. Robinson,* 528 F.2d 1331, 1336 (2nd Cir.1975) ("Residents of the City of Bridgeport are also not necessarily a cognizable class."); *United States v. Foxworth,* 599 F.2d 1, 4 (1st Cir.1979) ("It can hardly be asserted that the registered voters in a given city or town are sufficiently 'distinct' to constitute a cognizable group").

Defendants' attempt to equate the residents of the Green Bay Division with large groups such as African–Americans, Hispanics, and women, then, fails to persuade the court. The size of the Green Bay Division alone will not qualify the residents of that division as a "distinct" group for Sixth Amendment purposes.

 Defendants do not rest their argument solely on geography or size, however. They also assert that rural residents are a "distinct" group for fair cross section purposes and that by excluding Green Bay Division residents from jury venires, the Eastern District of Wisconsin reduces the number of rural residents available for jury service and, thus, fails to present defendants with a jury composed of a fair cross section of the community.

Again, the court begins its analysis by looking to the test for distinctiveness articulated in *Raszkiewicz*: do rural residents share qualities that define them as a group; do such residents exhibit a similarity of attitudes, beliefs, or experiences; and is there a community of interest among such residents? *See Raszkiewicz,* 169 F.3d at 459. Here, too, the defendants' expert has failed to point to any factors that might satisfy the second or third prongs of the test. Taking heed of the test's order not to apply its factors mechanistically, *id.,* the court is willing to entertain the possibility that the District's plan may nonetheless violate the fair cross-section requirement. As the Third Circuit Court of Appeals noted in *Zicarelli,* courts have been willing to accept fair cross-section claims based on geography when it can be shown that the excluded area is "profoundly culturally distinct." 633 F.2d at 320.

In *United States v. Tranakos,* 690 F.Supp. 971 (D.Wy.1988), the United States District Court for the District of Wyoming found that district's jury selection plan unconstitutional because grand jurors were not drawn from the Lander Division, a portion of the state that contains the Shoshone and Arapaho Indian Reservations. The court found the Indian residents of the division to share certain interests and found that the district's plan, as administered, significantly under-represented community members who might

share those interests. Similarly, in *United States v. Jackman*, 48 F.3d 1240 (2nd Cir. 1995), the court declared unconstitutional a jury venire that had been drawn according to a plan that disproportionately excluded residents of Hartford and New Britain, Connecticut—the two cities of the judicial district that contained the district's greatest numbers of Hispanic and African-American residents, groups that have previously been found "distinct" for Sixth Amendment purposes. In both of these cases, the question was primarily a cultural one, not a geographic one. *See, e.g., Tranakos*, 690 F.Supp. at 972–73 ("Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or under represented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury present a … 'cross section of the community'") (quoting *United States v. Anderson*, 577 F.Supp. 223, 228 (D.Wy.1983)).

The question in the present case then becomes, are the rural residents of the Green Bay Division so different from their peers in the Milwaukee Division that they are culturally "distinct?" Those courts that have grappled with whether the relatively urban or rural nature of a geographic area makes its residents "distinct" for the purposes of the fair cross-section requirement uniformly have answered "no." Indeed, this appears to have been the Seventh Circuit Court of Appeals' conclusion in *United States v. Balistrieri*, 778 F.2d 1226, 1229 (7th Cir.1985) ("the fact that the Green Bay venire may have been more 'rural' than a Milwaukee venire might have been does not violate a defendant's right to a jury drawn from a cross-section of the

community"). One can look back to Judge Hand's decision in *Gottfried* for the same analysis. 165 F.2d 360 at 363–64. The defendants do not point the court to any cases that have held a jury venire unconstitutional due to the relative urbanicity of an included or excluded segment of the population.

■ The court notes that both the Green Bay Division and the Milwaukee Division contain rural areas.[9] Defendants' expert has testified that he cannot point to any differences in characteristics between the rural residents of the first division as opposed to the second. The defendant bears the burden of showing that any excluded group is a distinct group within the community. *See Duren*, 439 U.S. at 364, 99 S.Ct. 664. In light of the fact no court has ever ruled that relative urbanicity can make the residents of a geographic area "distinct" for fair cross-section purposes; in light of the fact that rural residents have not been excluded from defendants' jury venires; and in light of the fact defendants' expert is unable to point to any characteristics that make the residents of the Green Bay Division—whether "urban" or "rural"—constitutionally or statutorily distinct, the court is unable to say that the defendants have carried their burden.

While the court is, indeed, instructed not to apply any test of "distinctiveness" mechanistically, *Raszkiewicz*, 169 F.3d at 459, such application must be done with the main purpose of the fair cross-section requirement in mind—to assure the defendant the benefit of an impartial jury. *See id.* The court has the utmost faith that the present defendants will enjoy that benefit, even if their jury venires are drawn

9. The defendants assert that if Green Bay Division residents are included in their jury venires, statistically they could expect to have one more rural juror in each of their trials. Factually, this is exactly the situation faced by the Second Circuit in *Gottfried*, discussed *supra*. 165 F.2d at 364 ("if the draft was from the whole district, the chance that any single juror would be 'rural' would be about sixteen percent; and, if the eight counties were ex-

cluded the chance would be about seven per cent. In other words, if the northern counties were included, an accused would have about an even chance of getting two 'rural' jurors on a panel of twelve; and, if they were excluded, he would have had not quite an even chance of getting one."). The Second Circuit Court of Appeals found this situation to be constitutionally acceptable.

only from the lower seven counties of this judicial district. Indeed, the defendants have presented absolutely no evidence that the current jury selection plan affects a jury's partiality.

Accordingly, the court rejects defendants' fair cross-section of the community claims because they have not established the first prong of the *Duren* test, that the excluded group is a distinctive part of the community. *Duren,* 439 U.S. at 364, 99 S.Ct. 664. Where it is a question whether we are dealing with a distinctive group at all, much more concreteness of argument than the defendants have shown here— such as some specific showing of purportedly shared values—is required before a court may find a fair cross-section violation. *Cf. Raszkiewicz,* 169 F.3d at 466 (requiring specificity in any argument that an excluded group is "distinct").

## C. SUPERVISORY POWER

Finally, the defendants request that the court exercise its supervisory power and order modification to this district's jury-selection system so that either residents of the Green Bay Division are eligible for jury service in the Milwaukee Division or that a court is established in the Green Bay Division. The government responds by suggesting that the court determine, on a case-by-case basis and in accordance with Federal Rule of Criminal Procedure 18, whether jurors for a particular case should be selected from the Green Bay Division.

■ The federal courts' supervisory power stems from the courts' power to control their own procedures. *United States v. Williams,* 504 U.S. 36, 45, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Thus, "federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

■ Aside from arguing that the court should act to rectify the alleged violations of the equal protection and fair cross section guarantees of the United States Constitution and Jury Selection and Service Act of 1968, defendants argue that the court should act to correct two alleged technical violations of the JSSA. First, 28 U.S.C. § 130(a) states that the federal district court for the Eastern District of Wisconsin "shall" sit in Green Bay. As this was an unfunded mandate, the court does not sit outside the Milwaukee Division. Next, 28 U.S.C. § 1861 sets out the policy goal that all citizens should have an opportunity to be considered for grand and petit jury service. As a practical matter, the residents of the Green Bay Division do not. Neither of these "violations" rises to such a level so as to require striking of the jury venire or a stay of the action.[10] Nonetheless, the defendants suggest that such alleged violations do counsel action by the court.

■ The courts' supervisory power serves three basic purposes: (1) to imple-

**10.** 28 U.S.C. § 1867(a) states, "In criminal cases ... the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of *substantial failure* to comply with the provisions of this title in selecting the grand or petit jury." (Emphasis added.) A substantial failure is one that contravenes one of the two basic principles of the Act: (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria. *See United States v. Savides,* 787 F.2d 751, 754 (1st Cir.1986). "Technical violations, or even a number of them, that do not frustrate the random selec-

tion and cross section requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply." *Id.* (citing *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984); *United States v. Bearden,* 659 F.2d 590, 600–601 (5th Cir. 1981)). Here, defendants have not suggested that the court's failure to sit in Green Bay interferes with the random selection of jurors or the determination of juror qualifications on the basis of objective criteria. As such, a stay would be inappropriate even if the court were to agree that violations of the JSSA have occurred.

ment a remedy for violation of recognized rights; (2) to preserve judicial integrity by ensuring that a conviction rests upon appropriate considerations validly before the jury; and (3) as a remedy designed to deter illegal conduct. *See Hasting,* 461 U.S. at 505, 103 S.Ct. 1974. It is the view of the court that in these cases, notwithstanding the alleged technical violations of the JSSA, the underlying purposes served by the court's supervisory power are not implicated. In light of the court's conclusion that neither the defendants' nor Green Bay Division residents' constitutional rights are violated by the current jury selection system, exercising the court's supervisory power will not remedy a violation of a recognized right nor will it serve to deter illegal conduct. In addition, the geographical composition of the jury alone will not adversely impact on the ability to select a fair and impartial jury. As such, the court will not order changes to the jury selection plan to require the inclusion of Green Bay Division residents.

Each of the district judges assigned to these cases, of course, is able to exercise his own supervisory power within the dictates of Rule 18. As stated in the rule, the court shall "fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice." These are case specific considerations that the parties are able to raise prior to trial by way of motion setting forth the reasons with particularity.

### CONCLUSION

For the reasons set forth above, the defendants' motions to strike the jury pool and to stay further proceedings will be denied.

Accordingly,

**IT IS ORDERED** that defendants Scott and Elizabeth Conant's motion to strike the petit jury pool be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that defendants Scott and Elizabeth Conant's mo-

tion to stay further proceedings be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that defendant Steven Imig's motion to strike the petit jury pool be and the same is hereby **DENIED;** and

**IT IS FURTHER ORDERED** that defendant Steven Imig's motion to stay further proceedings be and the same is hereby **DENIED.**