**UNITED STATES of America,**
**Plaintiff,**

v.

**James A. TRAFICANT, Jr., Defendant.**

**No. 4:01CR207.**

United States District Court,
N.D. Ohio,
Eastern Division.

June 25, 2002.

Craig S. Morford, AUSA, Bernard A. Smith, AUSA, Matthew B. Kall, AUSA, Cleveland, OH, for Plaintiff.

James A. Traficant, Jr., Youngstown, OH, pro se.

Lloyd Pierre–Louis, Esq., Law Office of Lloyd Pierre–Louis, Percy Squire, Law Office of Percy Squire, Columbus, OH, for Defendant.

## MEMORANDUM OF OPINION AND ORDER DENYING DEFENDANT TRAFICANT'S MOTION FOR NEW TRIAL

WELLS, District Judge.

A jury found Defendant Traficant guilty of counts one through ten of the superseding indictment on 11 April 2002. (Docket # 341). On 22 April 2002, Defendant Traficant filed a timely motion for a new trial. (Docket # 347). That same day, a supplemental memorandum to the motion for a new trial was filed on Congressman Trafi-

cant's behalf by Attorneys Percy Squire and Lloyd Pierre–Louis.[1] (Docket # 349). The United States responded to the arguments made in the original motion for a new trial on 3 May 2002. (Docket # 354). The United States filed a response to the supplemental memorandum on 29 May 2002. (Docket # 403). The defendant, in turn, filed a reply on the Juror Selection Plan issue. (Docket # 411).

For the reasons that follow, Congressman Traficant's motion for a new trial is denied.

## I. STANDARDS

Congressman Traficant moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, or in the alternative, moves to arrest the judgments of guilt against him pursuant to Rule 34 of the Federal Rules of Criminal Procedure.

Rule 33 provides, "On a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." Rule 34 provides, "The court on motion of a defendant shall arrest judgement if the indictment or information does not charge an offense or if the court is without jurisdiction of the offense charged."

## II. ANALYSIS

In his original motion for a new trial, Congressman Traficant presents four arguments as to why he is entitled to a new trial. Congressman Traficant claims: (1) this Court erred by preventing Russell Saadey, Jr. from testifying at trial; (2) this Court erred by not permitting Linda Kovachik to testify to certain statements at trial; (3) this Court deprived him of a fair trial by making certain remarks with the jury present; and (4) he discovered new evidence that is material and would probably result in a different verdict at a new trial. In their supplemental memorandum, Attorneys Squire and Pierre–Louis contend that the Juror Selection Plan of the Northern District of Ohio fails to comply with federal statutes and the U.S. Constitution because it results in geographic under-representation of Youngstown jury division voters on juries in the district.

This Court will examine each argument in turn.

### A. Russell Saadey's Testimony

■ Congressman Traficant argues that the Court erred when it denied the jury an opportunity to hear the testimony of Russell Saadey, Jr. He contends that the testimony would not have been hearsay because it met the requirements for the statement against interest exception of Rule 804(b)(3) of the Federal Rules of Evidence and the excited utterance exception of Rule 803(2).

In its 1 April 2002 Order Granting the Government's Oral Motion to Bar the Testimony of Russell Saadey, Jr., this Court ruled that Mr. Saadey could not testify as a defense witness because Congressman Traficant violated Federal Rule of Criminal Procedure 26.2,[2] not because of any

---

**1.** In its 7 May 2002 Order Regarding Representation of Defendant Traficant, this Court decided that Attorneys Squire and Pierre–Louis may serve as co-counsel during post-trial proceedings before this Court for the limited purpose of challenging the Juror Selection Plan of the Northern District of Ohio. (Docket # 357). Thus, the Court accepted for review the supplemental memorandum in support of the motion for new trial, which

challenges the Juror Selection Plan of the Northern District of Ohio.

**2.** Rule 26.2(a) provides,

After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order ... the defendant ... to produce, for the examination and use of the moving party, any statement of the witness that is in [his] possession and that relates to

hearsay problems.[3] (Docket # 317). The Court explained,

> Defendant Traficant claims to have possessed an audiotape containing the oral statement of a defense witness. According to the Congressman's representations, the taped statement involved issues at the heart of the witness's testimony. Yet, after the direct examination portion of the voir dire and in response to a government request and a Court order to produce the tape, Defendant Traficant unambiguously indicated that he would be unable to produce the audiotape because he had totally destroyed it the night before.
>
> By destroying the tape, Congressman Traficant elected not to turn it over to the government as required by Rule 26.2.

(Docket # 317 at 4).

Under Rule 26.2, this Court's decision to bar Mr. Saadey's testimony was appropriate. Congressman Traficant is not entitled to a new trial on the basis of the exclusion of Mr. Saadey's testimony.

## B. Linda Kovachik's Testimony

■ Next, Congressman Traficant asserts that this Court erred when it did not permit Linda Kovachik, a defense witness, to testify to a statement by Charles O'Nesti to her regarding kickbacks.

In his motion for a new trial, Congressman Traficant argues that Ms. Kovachik's testimony regarding Mr. O'Nesti's statement should have been admitted as substantive evidence under Rule 807, as a residual exception to the hearsay rule of the Federal Rules of Evidence. During the trial, Mr. Traficant offered the statements first as substantive evidence and then under Rule 613(b) only to impeach the prior testimony of Jacqueline Bobby and Grace Kavulic, who testified that Mr. O'Nesti complained to them that he had to make salary kickbacks to Congressman Traficant. *See* 2/19/02 Tr. at 562, 644–45.

In its 1 April 2002 Order Regarding Testimony to Impeach Government Witnesses, this Court explained,

> Linda Kovachik testified as a defense witness on 27 March 2002. A hearsay voir dire outside the presence of the jury was held the next morning. During the voir dire, Ms. Kovachik testified that Charles O'Nesti stated to her: "I had not gotten any kickbacks from Jim." (3/28/02 Tr. at 5274).
>
> At the time of the testimony and hearsay voir dire of [Ms. Kovachik and two other defense witnesses], Defendant Traficant argued that the statements of ... Charles O'Nesti were admissible as substantive evidence under an exception to the hearsay rule.

the subject matter concerning which the witness has testified.

Rule 26.2(f) defines a "statement" to include a mechanical recording of an oral statement. Rule 26.2(e) explains the sanction for failure to produce a statement: "If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed."

**3.** In light of the Court's ruling that Mr. Saadey's testimony was excluded under Rule 26.2, the Court did not rule on the hearsay issues surrounding Mr. Saadey's testimony. During a voir dire outside the presence of the jury, Mr. Saadey testified that James Sabatine told him that "he gave political contributions, not bribes" to Congressman Traficant. (3/27/02 Tr. at 5213). This statement is not a statement against interest so the Rule 804(b)(3) exception would not apply. Even if the statement were an excited utterance, its admission would not have affected the outcome of the trial because the jury did not find that Congressman Traficant committed the racketeering act involving James Sabatine.

However, in his motions of 27 March 2002, Defendant Traficant contended for the first time that he sought to admit the above statements only for the purpose of impeaching the testimony of . . . Jacqueline Bobby, and Grace Kavulic. (Docket # 319 at 2).

The Court continued,

Ms. Kovachik's testimony regarding Mr. O'Nesti's alleged statement to her is not admissible. The statement cannot be used to impeach prior testimony by Ms. Bobby or Ms. Kavulic because it is not inconsistent with any testimony by either witness. Neither witness testified that Mr. Traficant gave kickbacks *to* Mr. O'Nesti.

(Docket # 319 at 4) (emphasis added).

Put simply, Ms. Kovachik's voir dire testimony that Charles O'Nesti stated to her: "I had not gotten any kickbacks *from* Jim" could not be admitted as either substantive evidence or to impeach the testimony of Ms. Bobby and Ms. Kavulic. The statement could not be admitted as substantive evidence because it was irrelevant under Rules 401 and 402 of the Federal Rules of Evidence; there were no allegations in the superseding indictment that Congressman Traficant made kickbacks *to* Charles O'Nesti. The statement could not be admitted to impeach the testimony of Ms. Bobby or Ms. Kavulic because neither testified that Congressman Traficant made any kickbacks *to* Charles O'Nesti.

Under the Federal Rules of Evidence, this Court's decision not to admit Ms. Kovachik's testimony regarding Mr. O'Nesti's statement to her was correct as a matter of law. Congressman Traficant is not entitled to a new trial on the basis of the exclusion of this portion of Ms. Kovachik's testimony.

## C. This Court's Remarks

■ Congressman Traficant argues that this Court deprived him of a fair trial when the Judge asked him, on the morning of 3 April 2002, after the Congressman announced, with the jury present, "I have no other witnesses", whether he was prepared to rest and whether he intended to testify as a witness.

The context sheds light on these remarks in this protracted trial. Throughout the presentation of his defense, Mr. Traficant consistently failed to produce or call a sufficient number of witnesses to fill the trial day and frequently said he did not know who his witnesses would be for the next court session.[4] As a result, the jurors and alternate jurors, some of whom traveled as long as *five hours* each day to and from the court house, frequently had to be excused early, unnecessarily prolonging their jury service in this ten week trial.

All the trial participants were affected. On 21 March 2002, this Court agreed to excuse the jury for the next day in order to provide Congressman Traficant with an opportunity to voir dire two particular defense witnesses in his efforts to establish the requirements for an exception to the hearsay rule for certain statements by them. (3/21/02 Tr. at 4541, 4560). However, on Friday, 22 March 2002, with everyone else ready to proceed, Congressman Traficant failed to produce either witness for voir dire and the day's proceedings had to be adjourned after only a few minutes. (3/22/02 Tr. at 4564).

On the next trial day, Monday, 25 March 2002, the jury was excused early because Congressman Traficant ran out of witnesses. (3/25/02 Tr. at 4767). After encountering the same problem on Tuesday,

4. The United States' brief lists at least ten occasions when these failures of the Congressman to have his witnesses available resulted in delays during this long trial. (Docket # 354 at 5–9).

26 March 2002, the Court had to release the jury early and, mindful of defendant's *pro se* status, the court again instructed the Congressman to bring enough witnesses to fill the next trial day. (3/26/02 Tr. at 4954).

The Court had no choice but to again release the jury early on Monday, 1 April 2002. (4/1/02 Tr. at 5602). On Tuesday, 2 April 2002, Congressman Traficant's continuing failure or refusal to bring a sufficient number of witnesses forced the Court to dismiss the jury early yet again. (4/2/02 Tr. at 5778). In order to ensure that the next trial day could proceed, the Court, the *pro se* defendant, and counsel for the United States had a discussion, outside the presence of the jury, of who he would call on Wednesday.

> MR. TRAFICANT: I'm looking for the fellow from T.C. Ready Mix who is out of town. I'm trying to find a custodian of records of T.C. Ready Mix to see if I can get them here. And I thought a fellow did some work at the farm, I thought this was that fella, [a witness the defendant had subpoenaed and just examined] unless the name is unusually different. I thought it was a Tim Chesney, not a Herb Chesney. And Mr. Terlecky now. And if Mr. Morford takes my request, then we'd be closing out with me ... And I'm winding my case down.

(4/2/02 Tr. at 5769–71). The United States responded:

> MR. MORFORD: Your Honor, the problem here is we ask every night for the Congressman to tell the Court who he's going to call to avoid these kind of problems. The Congressman knew what he wanted Mr. Kerchum to testify to, and he knew what he wanted Mr. Hudach to testify to, and he knew this Court had already had a ruling months ago saying he couldn't do that. So he knew they weren't going to be able to testify. Your Honor told Congressman Traficant yesterday to have Mr. Terlecky and Mr. Johnson here today, and his comment was, "I'm not calling them until I see an order." The Court issued an order last night, and he didn't call him and he didn't call him until this morning, and this is not the first time he's run out of witnesses. ... And now he's not telling you who he's going to call tomorrow, and we're going to go through this again.

(4/2/02 Tr. at 5772–73). Outside the presence of the jury, the Court again instructed the *pro se* defendant:

> THE COURT: Congressman, this is your case. You're supposed to be prepared. You're supposed to get your witnesses and get your subpoenas out. ... [Y]ou need to present witnesses when [the] jury is here.

(4/2/02 Tr. at 5773–74).

The jury had been in the box less than two hours during the morning of Wednesday, 3 April 2002 when the Congressman announced: "I have no other witnesses." The Court therefore inquired, "Congressman, do you rest?" The Congressman sarcastically replied: "Every evening." (4/3/02 Tr. at 5846). The Court then explained it could "not permit [the jury] to sit here idly for the balance of the day." (4/3/02 Tr. at 4847) and then stated,

> You have a constitutional right not to testify. If you want to testify in this case, then please proceed. This is the time. We need witnesses on the stand.

(4/3/02 Tr. at 4847).

Congressman Traficant then proceeded to complain about and misrepresent the Court's prior rulings and attempted on the spot to strike a deal with Assistant United States Attorney Craig Morford, in which Congressman Traficant would testify only if he were permitted to cross-examine Mr. Morford. (4/3/02 Tr. at 5848–5852). De-

fendant announced, in the presence of the jury: "I will take the stand if Morford takes the stand on prosecutorial misconduct." (4/3/02 Tr. at 5849, 5850). The Court had already issued and hand-delivered to the Congressman a written ruling that he could not condition his testimony if he elected to take the stand. *See* Docket # 328.[5]

Congressman Traficant's contention that the Court's trial management remarks with the jury present violated his Fourteenth Amendment due process rights has no merit.

As the United States points out, this Court's remarks do not constitute impermissible comment on the defendant's failure to testify under *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *Griffin* holds that the Fifth Amendment forbids either comment by the prosecution on the accused's silence or "instruction by the court that such silence is evidence of guilt." Id. at 615, 85 S.Ct. 1229. Here the prosecutor made no challenged comment. The Court did not instruct, or even suggest, that silence is evidence of guilt. This Court did not instruct the jury, as the Griffin trial court had, that "if [the defendant] does not testify, or if though he does testify, he fails to deny or explain such evidence, the jury may take that failure . . . as tending to indicate the truth of such evidence and as indicating that among inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more

probable." Id. at 618, 85 S.Ct. 1229. Nor did this Court's challenged remarks comment upon defendant's failure to take the witness stand. This Court's reminder to the Congressman, with the jury present, that he had a right to testify did not create negative inferences from his subsequent decision not to testify. Further, this Court did nothing to "solemnize the silence of the accused into evidence against him," or instruct the jury that silence is evidence. Id. at 614, 85 S.Ct. 1229.

On the contrary, the Traficant trial jurors had been specifically and repeatedly instructed from the beginning to the end of the trial that Congressman Traficant had "a constitutional right not to testify;" that "if he [did] not testify, that must not be considered by them for any purpose whatsoever;" that the "defendant has no obligation to present any evidence at all, or to prove in any way that he is innocent;" that the "defendant has an absolute right not to testify;" that the jury may not "consider for any purpose his decision not to testify;" and that they were not permitted to discuss or "consider for any purpose the fact that Defendant Traficant did not testify." (2/13/02 Tr. at 15–16; 4/5/02 Tr. at 6163, 6170).

The Court's questions on 3 April 2002 did not violate Congressman Traficant's constitutional rights and he is not entitled to a new trial on the basis of these trial management inquiries.

---

5. After the jury had left for the day on 4 April 2002, the defendant and Assistant United States Attorneys worked with the Court to admit exhibits into evidence and again handled issues related to scheduling. The following colloquy took place:

THE COURT: But you understand if you have no witnesses here tomorrow morning or none of your witnesses are available to testify at any time before we get to the noon hour [Friday jury recess time], then we get

into this issue that you feel very concerned about, which is although we all know that you have a constitutional right not to testify, if you're going to testify, you will then have to do that sometime within the period of time where we have the jury here ready to hear evidence . . . You understand that?

MR. TRAFICANT: Your Honor, I understand that.

(4/4/02 Tr. at 6129–30).

## D. New Evidence

■ Congressman Traficant also claims to have discovered new evidence after the trial that he claims is material and would probably result in a different verdict at a new trial. The Congressman's "new evidence" takes the form of five letters,[6] which he attaches to his motion as Exhibits 1 through 5.

Exhibit 1 is a letter from Michael Antonoff,[7] in which Mr. Antonoff claims that he spoke with a Richard Gerhart, who told Antonoff that "FBI agents canvassed [his] neighborhood and questioned neighbors of his and Brian Kidwell's,[8] referring to Kidwell and Congressman James Traficant." (Docket # 347 at Exhibit 1). Antonoff further asserts that, according to Mr. Gerhart, the agents, who Mr. Gerhart thought were investigating stolen vehicles, "appeared more interested in Congressman Traficant and Brian Kidwell than the stolen vehicles." (Docket # 347 at Exhibit 1).

This exhibit is not relevant to the charges in the superseding indictment or the credibility of any witness at trial. The Court can only assume that it was offered by Congressman Traficant to suggest that the FBI agents somehow acted in an inappropriate matter. The letter, however, indicates no misconduct on the part of the agents.

Exhibit 2 is another letter from Michael Antonoff. It is a slightly more detailed version of a letter that Congressman Traficant submitted to the Court on 15 March 2002 to support his Motion to Prohibit Government Agents From Harassing and Intimidating a Defense Witness.[9] (Docket # 238, 245). In his letter, Mr. Antonoff alleges that an unidentified man took pictures of his house. According to Mr. Antonoff, he followed the man's silver van in his own car. He claims that, while stopped at a red light, he "saw what appeared to be a black wallet with a small gold badge with several letters about the badge that looked like FBI." (Docket # 347 at Exhibit 2).

Like Exhibit 1, Exhibit 2 is not relevant to the charges in the superseding indictment or the credibility of any witness at trial. The letter does not even establish that any government agent, let alone an agent involved in the Traficant case, was taking pictures of Mr. Antonoff's house.

Exhibit 3 is a letter from Rick Berger, in which Mr. Berger claims to have heard the conversation between Richard Gerhart and Brian Kidwell that is the subject of Exhibit 1. Exhibit 3 is just as irrelevant as Exhibit 1.

Exhibit 4 is a letter from Rene Antonoff Lanzaro, Michael Antonoff's wife. The substance of this letter is nearly identical to that of Exhibit 2. Like Exhibit 2, Exhibit 4 is irrelevant to the charges in the superseding indictment and to the credibility of witnesses at trial.

Exhibit 5 is a letter from Brian Kidwell, in which he asserts that three unidentified men took an "unused USAG welder" out of his garage, where the welder allegedly had been stored. (Docket # 347 at Exhibit 5). According to Mr. Kidwell, the men told him that the "welder is not going to Cleveland" for the Traficant trial and that "if

---

**6.** Congressman Traficant refers to the letters as affidavits. However, none of the would-be affiants swear by oath or affirmation and under the pains and penalties of perjury that their statements are true. Consequently, the letters are not affidavits.

**7.** Mr. Antonoff is a private investigator who was hired by Congressman Traficant as a process server and who testified on his behalf. *See* 4/1/02 Tr. at 5460–61.

**8.** Brian Kidwell was a defense witness at trial.

**9.** The motion was denied on 15 March 2002.

you are asked, you did not see this welder going out of here." (Docket # 347 at Exhibit 5). Mr. Kidwell goes on to state,

When I testified in Cleveland at the Traficant Trial, Monday, March 25, 2002, I was afraid to mention to Congressman Traficant what had occurred and led the Congressman to believe that the welder would be delivered to Cleveland for inspection.

(Docket # 347 at Exhibit 5). Mr. Kidwell then claims to have told Congressman Traficant of the alleged welder-snatching incident on 6 April 2002.

In response to Mr. Kidwell's claims, "the government unequivocally denies that it has any knowledge of the whereabouts or circumstances surrounding the welding machine." (Docket # 354 at 9–10). The United States argues that "Congressman Traficant fails to cite any legal basis under which his wild claims about the welder entitle him to any relief." (Docket # 354 at 10).

Three counts of the superseding indictment involved the USAG welder to some extent. Count 3, which charged a conspiracy to violate the illegal gratuity provision of the federal bribery statute, alleged, in part, that Congressman Traficant

asked Defendant [Richard] Detore [of USAG] if USAG had a generator and welder he could use. Based on this request, Defendant Detore caused USAG to purchase a new generator and welder and caused USAG employees to deliver them to Defendant Traficant for and because of the official actions Defendant Traficant was taking and would take on behalf of USAG. Defendant Traficant did not pay USAG for the generator and welder.

(Superseding Indictment, Count 3, ¶ 14). The welder also was implicated in Count 9, which charged Congressman Traficant with filing a false tax return for tax year 1999, and Racketeering Act 4 of the RICO count (Count 10), which alleged an illegal gratuity involving USAG and Congressman Traficant.

Congressman Traficant called Mr. Kidwell as a defense witness on 25 March 2002. Mr. Kidwell testified that USAG purchased the welder so that he could build aluminum trailers for the company in his garage. (3/25/02 Tr. at 4727, 4758–59). According to Mr. Kidwell, he never signed a contract with or received any written confirmation from USAG regarding the trailers. (3/25/02 Tr. at 4759). He stated that USAG never placed an order. (3/25/02 Tr. at 4763). Mr. Kidwell also testified that Congressman Traficant delivered the 700 or 800 pound welder to him. (3/25/02 Tr. at 4722–23). When asked how the welder was transferred to his truck, Mr. Kidwell stated, "We backed the two trucks up together and tailgate—the tail gate and roll it on some wheels." (3/25/02 Tr. at 4723).

When asked if the welder was being brought to Cleveland for the jury to view, as Congressman Traficant persistently claimed, Mr. Kidwell testified under oath that it was on its way. (3/25/02 Tr. at 4722). When asked when he expected the welder to arrive, Mr. Kidwell responded, "I'm not sure. The trailer he had it on, the wheel bearing went out on it." (3/25/02 Tr. at 4722–23). Mr. Kidwell then assured Congressman Traficant that the welder would arrive that day or the next day. (3/25/02 Tr. at 4723).

To the extent that Congressman Traficant attaches the Kidwell letter to his motion for a new trial in order to imply that the government was somehow involved with the alleged welder-snatching, this implication is not a basis for the granting of a new trial. The United States represents that it has no knowledge of the welder's location or the circumstances surrounding

the welder. The Kidwell letter does not contradict this representation.

Mr. Kidwell's statements in the letter are not credible. Nor is Mr. Kidwell disinterested as he and the Congressman "are pretty good friends." (3/25/02 Tr. at 4751). Mr. Kidwell's testimony at trial, taken as a whole, was not believable. He claimed that USAG bought him a welder and generator to build hi-tech trailers out of his garage, but that there was no documentation to confirm this arrangement and no order was ever placed. Thus, according to Mr. Kidwell, USAG bought the equipment for him before an order for even a single trailer was placed by USAG. Mr. Kidwell testified that, instead of shipping the welder directly to him, USAG gave the welder to Congressman Traficant so that he could transport it by truck from Washington D.C. to Youngstown, Ohio.[10]

Mr. Kidwell implicitly concedes his lack of credibility. In his letter, he asserts that he lied on the stand when he stated that the welder was on its way to Cleveland.

The alleged welder-snatching incident is not credible. Mr. Kidwell's claim, which is uncorroborated, is that "three big white men . . . loaded, by hand, lifting the welder onto the bed of the blue Ford Pickup truck." (Docket # 347 at Exhibit 5). According to Mr. Kidwell, the welder weighed 700 or 800 pounds. His testimony at trial was that moving the welder the short distance from Congressman Traficant's truck to Mr. Kidwell's truck at the same level across the two tailgates required the use of wheels.

In the letter, Mr. Kidwell states that Congressman Traficant was informed about the welder-snatching incident on 6 April 2002 at 5:50 a.m. Mr. Traficant, however, made no mention of the alleged inci-dent until 22 April 2002, when he attached the Kidwell letter to his motion for a new trial.

Even if Mr. Kidwell's claims were credible, Congressman Traficant would not be entitled to a new trial. Although the Court, at defendant's request, made arrangements for a jury view of the welder, which was never produced, such a view could have had little or no impact on the jury's verdicts on Counts 3 and 9 and would have had no impact on their verdict for Count 10. (3/25/02 Tr. at 4573–4587). The evidence presented by the United States on Count 3 was substantial and largely un-contradicted. Both Count 3 and Count 9 included several allegations other than those involving the welder. Congressman Traficant would have been convicted of Count 10 even if the jury had decided that he did not commit Racketeering Act 4 because the jury unanimously found that he had committed seven other racketeering acts.

In short, the Kidwell letter is not "likely to produce an acquittal" on any count of the superseding indictment at a new trial. *United States v. O'Dell,* 805 F.2d 637 (6th Cir.1986). It is not the interests of justice to grant a new trial on the basis of the letter.

### E. Challenge to the Juror Selection Plan

In his supplemental memorandum in support of his motion for a new trial, Defendant Traficant, represented by counsel, challenges the Juror Selection Plan of the U.S. District Court for the Northern District of Ohio ("the Plan") on the basis of geographic under-representation. He contends that the Plan violates the Jury Selection and Service Act ("JSSA"), his Sixth

---

**10.** Albert Lange, Jr. testified that he and Richard Detore delivered the welder to Congressman Traficant in the parking lot of his Con-gressional office building in Washington, D.C. (3/14/02 Tr. at 3600–01).

Amendment right to a jury representing a fair cross section of the community, and the equal protection component of the Fifth Amendment Due Process Clause.[11] Defendant Traficant also argues that the administration of the Plan does not comply with the terms of the Plan.[12]

In an effort to support his claims, Congressman Traficant filed an affidavit from Deborah Wasserman, PH.D., who, based on data provided by the defense and several assumptions, concluded that a voter residing in the Cleveland jury division has a 66% greater chance of being selected for jury service than a voter residing in the Youngstown jury division. (Wasserman Aff. at 2).

Congressman Traficant seeks "an immediate evidentiary hearing and oral argument ... to fully develop the extent of geographic disparity now inherent in the operation of the ... Plan." (Reply at 13).

For the reasons set forth below, this Court finds the Congressman's claims to be without merit as a matter of law, obviating the need for an evidentiary hearing.

### 1. The Juror Selection Plan

The Juror Selection Plan of the Northern District of Ohio was adopted by the judges of the district on 7 April 1997 and approved by the Judicial Council of the Sixth Circuit[13] on 8 August 1997. An amendment to Section H of the Plan[14] was adopted by the judges of the district on 4 June 2001 and approved by the Sixth Circuit Judicial Council on 10 July 2001.

The Plan divides the Northern District of Ohio into four jury divisions, each to serve an area surrounding one of the four court house locations in the district: Akron, Cleveland, Youngstown,[15] and Toledo. A division is defined as: (1) one or more statutory divisions of a judicial district; or (2) *in statutory divisions that contain more than one place of holding court ... such counties ... surrounding the places where court is held as the district court plan shall determine.* 28 U.S.C. § 1869 (emphasis added). Thus, as used in the JSSA, the term division refers to the jury divisions established by the Juror Selection Plan. The District is divided into four jury divisions in order to reduce the travel time of jurors, reduce the cost to the Court

---

**11.** Defendant Traficant contends that the Plan violates the Equal Protection Clause of the Fifth Amendment. However, the Equal Protection Clause is in the Fourteenth Amendment. "An equal protection claim against the federal government is analyzed under the Due Process Clause of the Fifth Amendment." *United States v. Ovalle*, 136 F.3d 1092, 1094, n. 2 (6th Cir.1998). Equal protection analysis under the Due Process Clause is the same as that under the Equal Protection Clause. *Id.*

**12.** In its response to the supplemental memorandum, the United States addresses each of these claims. To some extent, however, the United States' analysis assumes that Congressman Traficant is still claiming that his jury venire should have been drawn, at least in part, from the counties of the Youngstown jury division. This is not the Congressman's argument. *See* Reply at 5.

**13.** The Sixth Circuit Judicial Council consists of the chief circuit judge, the circuit judges, and the chief judges of the nine district courts located in the Sixth Circuit. 28 U.S.C. § 332(d)(2) requires judges to carry into effect all orders of the judicial council.

**14.** The amendment modified Section H, removing a reference to randomization routines approved by the National Institute of Standards and Technology. The amendment also required that the mathematical odds of a single name being drawn from a qualified jury wheel are substantially equal. Previously, the requirement only applied to the source list and master jury wheels. These modifications do not affect the issues raised in Congressman Traficant's supplemental memorandum.

**15.** The Youngstown jury division consists of Columbiana, Mahoning, and Trumbull counties.

of mileage expenses and overnight stays, and reduce the number of hardship excuses requested and granted due to travel. Because the judge randomly assigned to this case holds court in the Cleveland Court House, the Cleveland division jury wheel was used. The Cleveland jury division consists of the following counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina, and Richland.

Each jury division has its own master jury wheel, in which the names of prospective jurors are placed. Under the Plan, the population of each county in a particular division is to be substantially proportionally represented, as to other counties, in the master jury wheel for its own jury division. For example, if 20% of a jury division's voters live in a particular county, approximately 20% of the names placed in the division's master jury wheel should be from that county. Moreover, each name in a master jury wheel must have a substantially equal chance of being drawn.

Names are drawn randomly from each division's master jury wheel for trials in that division's court house. Every person whose name is drawn is sent a juror qualification form to be completed and returned. Potential jurors who are not disqualified, exempt, or excused pursuant to the Plan have their names placed in the qualified jury wheel. Each jury division has it own qualified jury wheel. When jurors are needed for a trial in a particular division, an appropriate number of names are drawn from the qualified jury wheel of that division.[16]

This process embodies the declared policy of the Northern District of Ohio "that all litigants in this Court, entitled to trial by jury, shall have the right to grand and petit juries selected at random from a fair cross section of the community in each division wherein the Court convenes." (Plan at 3). The Plan prohibits discrimination in jury selection on the basis of race, color, religion, sex, national origin, or economic status. (Plan at 3).

In this case, Defendant Traficant is not contesting the fact that each county is proportionally represented within its jury division or that every name has a substantially equal chance of being drawn from its jury wheel as any other name in that wheel. Rather, Congressman Traficant asserts that the Plan has been violated because prospective jurors in the Youngstown division jury wheels allegedly have a smaller statistical chance of being drawn than prospective jurors in the Cleveland division jury wheels.

Put simply, the plain terms of the Plan do not require that names in different master or qualified jury wheels in different jury divisions have an equal chance of being drawn. The Plan states, "The selection of names from the source list and the master wheel, and the qualified wheel must also insure that the mathematical odds of any single name being picked are substantially equal." (Plan at 5). Thus, the Plan requires that names *within a single jury wheel* have a substantially equal chance of being drawn. As Congressman Traficant does not contend that names within a single wheel have anything other than a substantially equal chance of being picked, there is no reason to believe that the Plan was not administered according to its terms in this case.

2. *The Congressman's Claims Are Time–Barred*

■ As the Juror Selection Plan was complied with in this case, the Court turns

---

16. "Ordinarily, all jurors will be summoned from the jury wheel of the court location in which the assigned Judge is sitting." (Plan at 10). However, the Plan authorizes the Judge to order the selection of a panel from another qualified jury wheel if necessary.

to Congressman Traficant's contention that the Plan violates the JSSA, the Fifth Amendment, and the Sixth Amendment.

Federal Rule of Criminal Procedure 12(b)(2) provides that "[d]efenses and objections based on defects in the indictment or information" must be raised prior to trial. Accordingly to the Sixth Circuit, this requirement applies to challenges to both grand and petit juries and both statutory and constitutional claims. In *United States v. Ovalle,* the Sixth Circuit held that "[f]ailure to raise an objection to the selection of the grand or petit jury prior to trial shall constitute waiver thereof" unless the defendant shows cause to excuse the failure. 136 F.3d 1092, 1107 (6th Cir.1998). The Court specifically stated that Rule 12(b)(2) governs untimely claims of discrimination in jury selection "even when such challenges are on constitutional grounds." *Id.*

In *United States v. Blair,* a defendant challenged jury selection under the JSSA and the Equal Protection Clause. Nevertheless, the Sixth Circuit stated, "it is clear that a defendant's failure to object to the composition of the grand jury prior to trial constitutes waiver of the argument." 214 F.3d 690, 699 (6th Cir.2000). The Court explained that, in order to show cause for the failure to make a timely objection, the defendant was required to "demonstrate an objective external factor that prohibited him from raising an objection to the jury selection plan prior to his trial." *Id.* at 700.

These Sixth Circuit decisions adhere to the rule established in *Shotwell Manufacturing Co. v. United States,* where the Supreme Court decided that a "challenge to the method of selecting the petit jury panel comes too late when not made before trial." 371 U.S. 341, 362, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963).

In this case, Congressman Traficant raised entirely different challenges to jury

selection prior to trial than those currently before the Court. On 14 January 2002, Defendant Traficant filed a motion for a venire selected from the entire Northern District of Ohio, rather than the Cleveland jury division, which the Court denied. (Docket # 128, 132). Jury selection began on 5 February 2002. On 6 February 2002, Congressman Traficant again objected to the jury selection process on the ground that jurors were not being selected from the entire Northern District of Ohio. (Docket # 180). The Court overruled this objection. (Docket # 183). On 11 February 2002 and 13 February 2002, he filed motions to dismiss the superseding indictment on the same ground and the additional ground that the amended Jury Selection Plan was approved by the Sixth Circuit after his original indictment was handed down. (Docket # 187, 192). These motions were denied. (Docket # 275). On 13 February 2002, Congressman Traficant filed an objection to the directions of the Court regarding peremptory challenges citing his confusion as to how the challenges were to be exercised. (Docket # 191). The objection was overruled by the Court. (Docket # 234).

In his reply, Defendant Traficant explicitly states that his current challenges to the Plan involve the alleged disparity between the odds of a Cleveland division voter and a Youngstown division voter being selected for jury service. This challenge is not a claim that Mr. Traficant was entitled to jurors from the Youngstown division and the rest of the district. In fact, the Congressman, through counsel, states, "The Government has again misrepresented Mr. Traficant's argument concerning the Plan—that he had a right to Youngstown jurors; that is not his argument." (Reply at 5).

Thus, Congressman Traficant's current claims regarding the Plan were not raised

in any of his prior motions or objections. They were raised for the first time in the 23 April 2002 supplemental memorandum filed by counsel in support of his motion for a new trial. (Docket # 349). Because the statutory and constitutional claims now before the Court were raised over two months after the beginning of Congressman Traficant's trial, they are time-barred by Rule 12(b)(2) unless there has been a showing of cause and actual prejudice. Mr. Traficant has not presented, or even mentioned, any objective external factor that prohibited him from raising his current challenges to the Juror Selection Plan prior to his trial. Accordingly, the claims are barred by Rule 12(b)(2).

In addition, the JSSA claim is barred by the JSSA itself. 28 U.S.C. § 1867(a) provides,

> In criminal cases, *before the voir dire examination begins,* or within seven days after the defendant discovered or could have discovered by the exercise of diligence, the grounds therefor, *whichever is earlier,* the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

(emphasis added). Section 1867(e) states, "[t]he procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime ... may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title."

The Sixth Circuit has held that the timing "requirements of the statute are strictly enforced." *United States v. Young,* 570 F.2d 152 (6th Cir.1978). The Sixth Circuit has interpreted § 1867(a) to require that any motions based on a JSSA claim must "be filed prior to the voir dire examination at the latest." *Ovalle,* 136 F.3d at 1099, n. 10. *See also, United States v. De Alba-*

*Conrado,* 481 F.2d 1266, 1269 (5th Cir. 1973) (stating that "one who fails to assert challenges before or during voir dire is foreclosed from later tardy actions which attack the validity of the jury plan."); *United States v. Gross,* 375 F.Supp. 971, 979 (D.N.J.1974) (stating that "[t]he selection of petit and grand juries is governed by a single statutory provision ... which requires all objection to the method of the jury's selection to be raised prior to the voir dire."). The Sixth Circuit's view of § 1867(a) is consistent with that of the House Committee which conducted hearings on the JSSA. The Committee stated, "the bill sets time limitations upon the availability of challenges. Subsections (a), (b), and (c) specify that challenges must be offered before the voir dire begins." H.Rept. 1076, 90th Cong., 2d. Sess. p. 15, U.S.Code Cong. & Admin.News 1968, p. 1805.

Congressman Traficant first referred to the JSSA in his 11 February 2002 motion to dismiss the superseding indictment. (Docket # 187). At that time, he claimed that the Plan violated the JSSA because the Plan allowed for juries selected from a single jury division rather than from the entire Northern District of Ohio. This is not his current fair cross section claim. Moreover, even the 11 February 2002 motion was untimely because voir dire began on 5 February 2002.

Thus, Congressman Traficant's current JSSA fair cross section claim was first offered in his 23 April 2002 supplemental memorandum in support of his motion for a new trial. (Docket # 349). Because the claim was not raised before voir dire as required by § 1867(a), it is untimely. Relief, therefore, is not available under the JSSA.

Congressman Traficant's statutory and constitutional challenge to the Juror Selection Plan is untimely. Therefore, it cannot

support his motion for a new trial. Nevertheless, the Court will examine the merits of the Congressman's claims because he broadly asserts them as somehow affecting his constituents.

### 3. The Sixth Amendment and JSSA Fair Cross Section Claims

■■■ In relevant part, the Sixth Amendment reads, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law ..." The Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Therefore, the "jury wheels, pools of names, panels, or venires from which juries are drawn must not systemically exclude distinctive groups in the community and therefore fail to be representative thereof." *Duren v. Missouri,* 439 U.S. 357, 363–64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The Sixth Amendment does not, however, impose a requirement that a petit jury actually "mirror the community and reflect the various distinctive groups in the population." *Taylor,* 419 U.S. at 538, 95 S.Ct. 692. The fair cross section requirement focuses on the jury pool, not the specific petit jury. The ideal embodied by the fair cross section requirement is a jury pool that "generally represent[s] the attitudes, values, ideas and experience of the eligible citizens that compose the community where the trial is taking place." *Barber v. Ponte,* 772 F.2d 982, 997 (1st Cir. 1985)(en banc).

The fair cross section requirement is an integral part of the JSSA, as well. Section 1861 of the JSSA provides,

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States.

28 U.S.C. § 1861. This policy is implemented by the requirement of section 1962 that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States ... on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

■■ The language of the Sixth Amendment and of the JSSA recognizes the right of district courts to establish jury divisions within a district. The validity of jury divisions consistently has been acknowledged by federal courts. In *Ruthenberg v. United States,* 245 U.S. 480, 482, 38 S.Ct. 168, 62 L.Ed. 414 (1918), the Supreme Court held that "the plain text of the Sixth Amendment, the contemporary construction placed upon it by the Judiciary Act of 1789 ... and the continuous legislative and judicial practice from the beginning" authorize the drawing of a jury from a part of the district. A defendant in a criminal case has no right to jurors drawn from the entire district, no right to jurors drawn from a particular division, and no right to a trial held in a particular division. *See United States v. Davis,* 27 Fed.Appx. 592, 597–98, 2001 WL 1662485, *5 (6th Cir.2001)(holding that "there is no constitutional or statutory requirement that a defendant's trial take place in a specific courtroom or division within a federal judicial district" and that the jury pool need not include anyone from the division in

which the crime took place); *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir.1983) (stating that "[a] petit jury may be drawn constitutionally from only one division and not the whole district."); *Zicarelli v. Dietz*, 633 F.2d 312, 316–18 (3d Cir.1980) (stating "there is no constitutional right to a jury chosen from the division where the offense was committed or from the entire district which includes that division."); *Zicarelli v. Gray*, 543 F.2d 466, 479 (3d Cir.1976); *United States v. Florence*, 456 F.2d 46, 49–50 (4th Cir.1972) (deciding that a defendant has no constitutional or statutory right to a jury selected from the entire district or from a particular division).

Congressman Traficant's Sixth Amendment and JSSA fair cross section claims manifest his two fundamental misunderstandings of the fair cross section requirement.

■ First, the basic premise of Congressman Traficant's fair cross section claims is that the Northern District of Ohio as a whole is the community to which the fair cross section requirement applies. This premise is incorrect. As the JSSA makes clear, defendants have the right to a petit jury "selected at random from a fair cross section of the community in the district *or* division." 28 U.S.C. § 1861 (emphasis added). Because the Northern District of Ohio is divided into four jury divisions by the Plan, as approved by the Sixth Circuit Judicial Council, Defendant Traficant has the right to a jury selected from a fair cross section of the Cleveland jury division. Because the fair cross section requirement applies *within* jury divisions, not *between* jury divisions, Mr. Traficant's claim of geographic under-representation of Youngstown division voters fails. The Youngstown jury division is not a group *within* a community; it *is* a community. If the fair cross section requirement applied to entire districts, jury divisions, which have been upheld as valid time and time again by federal courts, would be unworkable because jurors would have to be randomly selected from a fair cross section of the entire district.

■ Second, although Congressman Traficant purports to present a fair cross section claim under the JSSA and Sixth Amendment, as well as a Fifth Amendment equal protection claim, the only claim he is actually bringing is an equal protection claim. Defendant Traficant's case was randomly assigned to this Court in the Cleveland jury division.[17] As a result, like every other defendant assigned to a judge holding court in Cleveland, the Congressman's petit jury venire was drawn from the Cleveland jury division. Because Youngstown division voters do not serve on Cleveland division juries, any disparity in the chances of a Cleveland division voter and a Youngstown division voter being selected for jury service has no impact whatsoever on Congressman Traficant's venire. Moreover, Congressman Traficant now explicitly states that he is not claiming that Youngstown division voters should have been on his venire. (Reply at 5). A fair cross section claim focuses on the defendant's jury venire. By contrast, Congressman Traficant's claim is not about the representativeness of his venire. His claim actually focuses on the rights of prospective jurors in the Youngstown division. Thus, the Congressman's claims styled as fair cross section claims are actually equal protection claims. Equal protection claims cannot properly be brought under the JSSA or Sixth Amendment.[18]

17. The Cleveland jury division includes the following nine counties. Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina, and Richland.

18. The Sixth Amendment focuses on a defendant's right to a fair trial by an impartial jury. Equal protection concerns are embodied by the Fifth Amendment Due Process Clause and

Even if the defendant's fair cross section claims were not time-barred and even if they did not rely on fundamental misunderstandings of the fair cross section requirement, the claims would fail because Congressman Traficant cannot present a prima facie case.

 "Typically, challenges brought under the JSSA are reviewed under the same standard as a Sixth Amendment claim of denial of a jury representing a fair cross section of the community." *Ovalle,* 136 F.3d at 1099. *See also United States v. Brown,* 230 F.3d 1360, 1365 (6th Cir. 2000); *United States v. Conant,* 116 F.Supp.2d 1015, 1023 (E.D.Wis.2000) (stating that "the inquiry for evaluating a claim under the Sixth Amendment is identical to the inquiry for evaluating a claim under the Jury Selection and Service Act."). In order to show a prima facie violation of the fair cross section requirement under the JSSA or Sixth Amendment,

the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).[19] If a defendant fails to establish any of these elements he has failed to establish a prima facie violation of the fair cross section requirement.

 Congressman Traficant cannot satisfy the first element of the prima facie case because he cannot show that the group alleged to be excluded, prospective jurors in the Youngstown division, are a "distinctive," or cognizable, group.

In *Ford,* the Sixth Circuit adopted the following test for determining whether a group is distinctive for fair cross section purposes:

(1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity of attitude, ideas, or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

841 F.2d at 681–82. Groups found to be distinct by federal courts include African–Americans, women, Mexican–Americans, the less educated, daily wage earners, Native Americans, and Jewish persons. *See Lockhart v. McCree,* 476 U.S. 162, 175, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Barber,* 772 F.2d at 1002; *United States v. Butera,* 420 F.2d 564 (1st Cir.1970).

Federal courts consistently have found that residents of a geographic area are not a distinct, cognizable group based on their place of residence alone.

In *United States v. Conant,* 116 F.Supp.2d 1015 (E.D.Wis.2000), the defendant argued that the juror selection plan of the Eastern District of Wisconsin violated the fair cross section requirement because jurors were selected exclusively from the seven counties of the Milwaukee Division. Between 1981 and 2000, only one federal petit jury was drawn from the twenty-one counties of the Green Bay Di-

---

Fourteenth Amendment Equal Protection Clause.

19. *See also Davis,* 27 Fed.Appx. at 597–98; *Ovalle,* 136 F.3d at 1098, n. 7; *Ford v. Seabold,* 841 F.2d 677, 681 (6th Cir.1988).

vision. *Id.* at 1018. In analyzing the claim, the District Court noted that "every court that has looked at the question of whether the residents of a geographic area may constitute a 'distinctive' group for Sixth Amendment purposes solely due to the location of their residence has answered negatively." *Id.* at 1024. In concluding that the Green Bay Division was not a distinctive group, the Court refused "to equate residents of the Green Bay Division with large groups such as African–Americans, Hispanics, and women." *Id.* at 1025.

The decision by the district court in *Conant* was consistent with the Seventh Circuit's opinion in *United States v. Raszkiewicz,* 169 F.3d 459 (7th Cir.1999). As in *Conant,* the defendant in *Raszkiewicz* challenged the Eastern District of Wisconsin jury selection plan. The Seventh Circuit rejected the fair cross section challenge to the plan even though the administration of the plan excluded all Native Americans who lived in the six reservations of the district, all of which were situated in the Green Bay Division. *Id.*

In *United States v. Test,* the juror selection plan of the District of Colorado was at issue. 550 F.2d 577 (10th Cir.1976). The district was divided into three divisions: the Denver, Pueblo, and Grand Junction divisions. *Id.* at 582, n. 4. The defendants alleged that the fair cross section requirement had been violated because every fiftieth name from the Grand Junction division was placed in the master jury wheel, while every seventy-fifth name from the other two divisions was placed in the wheel. *Id.* at 582. The Tenth Circuit's response to the challenge made clear that a geographic area is not a distinct group:

> Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systemically excluded or underrepresented by reason of such imbalance,

does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community.

*Id.* (internal quotation marks omitted). The holding demonstrates the distinction between a "geographic imbalance" and a "cognizable segment of the community."

The defendants in *Test* also alleged that "the plan effectively excludes from petit jury service all persons who reside in the Pueblo and Grand Junction divisions, because the vast majority of the trials in this district are held in the Denver division." *Id.* at 594. The Tenth Circuit rejected this claim, as well, stating that "the partitioning of a district into jury divisions is sanctioned by the [JSSA] and is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines." *Id.*

Similarly, in *United States v. Butera,* the defendant contended that the fair cross section requirement was violated by the under-representation of residents of several Maine counties in his jury pool. 420 F.2d 564 (1st Cir.1970). The First Circuit declared that the counties were not a distinct group, stating "we are not aware that residents of counties can be said to hold views and attitudes which are in any way 'distinct' from those of their neighbors in nearby counties." *Id.* at 572.

The defendant in *United States v. Foxworth,* 599 F.2d 1 (1st Cir.1979), challenged the District of Massachusetts' system of grand juror selection on fair cross section grounds. Foxworth provided evidence that twenty four cities and towns in the Eastern Division of the district were not represented in the 1977 master jury wheel. *Id.* at 2. The First Circuit concluded that Foxworth had not presented a prima facie case, noting that "it can hardly be asserted that the registered voters in a

given city or town are sufficiently 'distinct' to constitute a cognizable group." *Id.* at 4. The court explained, "we cannot see that the views and attitudes of voters of one city or town are in any way 'distinct' from those of voters in a neighboring community." *Id.* at 4, n. 4.

Even before the enactment of the JSSA, the Second Circuit held that it was permissible for the Southern District of New York to draw its jurors exclusively from the Counties of Westchester, Bronx, and New York even though eight other counties were not represented in the jury pool at all. *See United States v. Gottfried,* 165 F.2d 360 (2d Cir.1948); *United States v. Kelly,* 349 F.2d 720 (2d Cir.1965).

Thus, it is well-established that the residents of geographic areas are not distinct, cognizable groups based on their place of residence alone. In some of the cases discussed above, federal courts held that the fair cross section requirement is not violated by even the total exclusion of residents of divisions, counties, and municipalities from the juror selection process.

For the residents of a geographic area to qualify as a cognizable group for jury selection purposes, geography must be a proxy for another, recognized distinct group. In *Zicarelli v. Dietz,* the Third Circuit suggested that the fair cross section requirement might "preclude exclusion of a geographic group when the group is profoundly culturally distinct." 633 F.2d 312, 321 (3d Cir.1980). This Court found only two cases in which this condition was met.

In *Alvarado v. State,* the Alaska Supreme Court found Alaska's juror selection system for the third judicial district to be violative of the fair cross section requirement. 486 P.2d 891 (Alaska 1971). Because all prospective jurors for the state judicial district were drawn from the area within a radius of fifteen miles of Anchorage, all but one of the 55 Native villages in

the district were excluded from jury service. *Id.* at 892, 895. In deciding that the fair cross section requirement was not met, the Alaska Supreme Court focused on the "very profound cultural differences" between the Native villages and urban Anchorage. *Id.* at 894. The court stated,

The evidence vividly portrays the enormous gulf which separates the mode of life of the typical Alaskan villager from the type of existence led by most residents of Anchorage and other cities of the state. The differences between a Native village and the City of Anchorage are neither simple nor superficial; they are not restricted to a single element such as occupation or income. Rather, the lines of separation are profound and intersect areas including occupation, economy, domestic relations, politics, language, religion, race, cultural heritage, and geography.

*Id.* at 899. In other words, the jury pool did not reflect a fair cross section of the third judicial district community because Native Alaskans, with their profoundly different culture and way of life, were almost completely excluded from the jury pool by the geographic restrictions of the juror selection system.

Similarly, in *United States v. Tranakos,* the defendants challenged the District of Wyoming's juror selection plan on the ground that it excluded from grand jury service residents of nineteen counties. 690 F.Supp. 971 (D.Wyo.1988). The defendants demonstrated that Shoshone and Arapaho Indians, who lived on the Wind River Reservation, were entirely excluded from jury service because the reservation was outside the geographic area from which all grand jurors were summoned. *Id.* at 973. The District Court found that "the Shoshone and Arapaho are manifestly a cognizable group, with unique ideas, values, customs and culture." *Id.* at 976. The court concluded that "they cannot be left out of the grand jury draw without

loss to the community." *Id.* Thus, in *Tranakos,* the complete exclusion of a geographic area (nineteen counties) from grand jury selection violated the fair cross section requirement because the geographic area included all of the members of a culturally unique cognizable group in Wyoming (the Shoshone and Arapaho Indians).

The cases cited by Congressman Traficant do not support the proposition that geographic areas are distinct groups for jury selection purposes. The Congressman cites three cases: *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); *United States v. Osorio,* 801 F.Supp. 966 (D.Conn.1992); and *United States v. Jackman,* 46 F.3d 1240 (2d Cir.1995).

In *Thiel,* the Supreme Court found that the clerk of court and the jury commissioner of the Federal District Court in San Francisco "deliberately and intentionally excluded from the jury lists all persons who work for a daily wage." 328 U.S. at 221, 66 S.Ct. 984. The Court was concerned with discrimination "against persons of low economic and social status" because it could "establish the jury as the instrument of the economically and socially privileged." *Id.* at 223, 66 S.Ct. 984. Thus, the Supreme Court held that exclusion of all those who earn a daily wage could not be justified by law. *Id.* at 222, 66 S.Ct. 984. In so holding, the Court stated,

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. This does not mean, of course, that every jury must contain representatives of all economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors

> shall be selected by court officials without systematic and intentional exclusion of any of these groups.

*Id.* at 220, 66 S.Ct. 984. It is this reference to geographical groups that Congressman Traficant emphasizes.

This single, isolated reference to geographical groups does not support Congressman Traficant's position that such groups are distinct groups for fair cross section purposes. *Thiel* related to daily wage earners, not geographic groups. When viewed in its entirety, the opinion is imbued with concerns of economic and social classes, not with residents of particular geographic areas. Moreover, every case discussed above and cited for the proposition that residents of a geographic area are not a distinct group for fair cross section purposes was decided after *Thiel.* None of the circuit or district courts in those cases found *Thiel* to be applicable to claims based on geography.

In addition, a few courts have specifically addressed *Thiel's* non-applicability to geography-based claims. Just two years after *Thiel* was decided, the Second Circuit examined the passage from *Thiel* in *United States v. Gottfried,* 165 F.2d 360 (2d Cir.1948). Judge Learned Hand opined that *Thiel*

> may well forbid the officials who draw up the lists from excluding any part of the district *at their own choice.* We assume that they may not do so; but if they do not, "geographical" uniformity is satisfied, for the district and circuit courts have had power since the first Judiciary Act of 1789 to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity.

*Id.* at 364 (emphasis added). Thus, according to Judge Hand, *Thiel* prohibits

discretionary discrimination by individual court officials, not the under-representation of residents of geographic areas by a juror selection plan.

Similarly, in *Zicarelli v. Dietz,* the Third Circuit rejected Congressman Traficant's overly-broad reading of *Thiel.* 633 F.2d 312 (3d Cir.1980). The Court stated,

> Nothing in the Thiel case itself supports that argument since the facts of that case involved exclusion of laborers who worked for a daily wage. There is manifestly a higher cohesion of interest among day laborers, who may be considered to represent an economic class, than among those brought together by the mere coincidence of the geographic unit where they live.

*Id.* at 317.

The second case cited by Congressman Traficant is *United States v. Osorio,* 801 F.Supp. 966 (D.Conn.1992). *Osorio* involved a claim that African–Americans and Hispanics were under-represented in the master jury wheel of the Hartford division of the District of Connecticut. Residents of New Britain and Hartford, the two largest cities in the division, were completely excluded from venires. *Id.* at 972. The District Court focused on the fact that "these two cities combine to account for 62.93% of the voting-age black population and 68.09% of the voting-age Hispanic population in the Division." *Id.* The Court did not address the issue of whether the residents of the cities were a distinct group because the fair cross section claim was based on race and ethnicity, not geography. The Court noted, "There is little question ... that both blacks and Hispanics are 'distinctive' groups in the community for purposes of this analysis." *Id.* at

977. Thus, this case does not stand for the proposition that residents of a geographic area can be a cognizable group.

Finally, Congressman Traficant cites *United States v. Jackman,* 46 F.3d 1240 (2d Cir.1995). *Jackman* also involved the juror selection system in the Hartford Division. The Second Circuit found that the master jury wheel determined to be unconstitutional in *Osorio* was still being used by the jury commissioner. *Id.* at 1245. The relevant circumstances of the case were the same as those in *Osorio.* The Court did not discuss whether residents of New Britain and Hartford were a distinct group for fair cross section purposes because the defendant's claim was based on race and ethnicity, not geography.

In this case, Congressman Traficant cannot meet the first element of the prima facie case of a fair cross section claim, that the group alleged to be excluded is a distinctive group in the community. Mr. Traficant contends that the residents of the Youngstown jury division are a cognizable group that must not be under-represented on venires in the Northern District of Ohio. Yet, the numerous cases discussed above demonstrate that geography alone is not enough to establish the distinctiveness of a group of residents. Exclusion of a geographic area from the jury pool might violate the fair cross section requirement where the residents of the geographic area are profoundly culturally distinct, as the Native Alaskans were in *Alvarado* and the Shoshone and Arapahó were in *Tranakos.* Here, Congressman Traficant brings a challenge based purely on geography—the alleged under-representation of the residents of the Youngstown jury division.[20] The Congressman does not assert, or even hint at, any profound cultural distinctive-

---

**20.** In his reply brief, Mr. Traficant explicitly states, "The N.D. Ohio Plan, the JSSA, and the Fifth and Sixth Amendment [sic] all preclude a procedure where a person has a sub-

stantially greater chance of being called for jury duty merely by reason of their [sic] place of residence. It is this disparity in the N.D.

ness of the residents of the division.[21] Thus, his fair cross section claims under the JSSA and Sixth Amendment would fail as a matter of law because he cannot meet the first element of a prima facie case.[22]

In summary, Congressman Traficant's fair cross section claims under the JSSA and Sixth Amendment fail for four reasons. First, the claims are time-barred. Second, the fair cross section requirement applies within jury divisions, not between jury divisions. Third, the Congressman's fair cross section claims are actually equal protection claims, which cannot properly be brought under the JSSA or Sixth Amendment. Fourth, the Congressman cannot meet the first element of a prima facie case for a fair cross section violation.

### 4. The Fifth Amendment Equal Protection Claim

 Congressman Traficant also contends that the Plan violates the equal protection component of the Due Process Clause of the Fifth Amendment. It is unclear whether he is attempting to bring this claim on his own behalf, on behalf of Youngstown division residents, or both. In his reply brief, Congressman Traficant asserts, "The Plan used in Congressman Traficant's trial discriminates against Youngstown Division residents ... of which Mr. Traficant is one." (Reply at 11). Essentially, Congressman Traficant's claim is that the Plan discriminates against Youngstown division residents because they allegedly have a smaller chance of being called for jury duty than Cleveland division residents.

As discussed above in Section E.2., this claim is time-barred. Moreover, to the extent that Mr. Traficant seeks to bring an equal protection claim on behalf of Youngstown division residents, he has not shown or even asserted his standing to do so.[23]

---

Ohio Plan that is being challenged here." (Reply at 5).

**21.** In his reply brief, Congressman Traficant does state,

> the goals of the JSSA and the Fifth and Sixth Amendment [sic] would be subverted if a jury selection plan may lawfully systemically exclude a group of cities within a division. A city with a large ethnic or racial minority population can be unfairly discriminated against. For example, the City of Youngstown, which is heavily populated by ethnic and racial minorities, can be systematically excluded on grounds that the geographic origin discrimination is legal, while suburban residents having very small minority populations have greater opportunities to serve on juries.

(Reply at 8). However, this isolated paragraph cannot be interpreted as an assertion of the profound cultural distinctiveness of the Youngstown jury division. An assertion of he presence of ethnic or racial minorities in one portion of the Youngstown division and the relative absence of such a population in one portion of the Cleveland jury division does not

amount to a claim that a substantial cultural gulf separates the two divisions.

**22.** As Congressman Traficant cannot meet the first element of the prima facie case, the Court will not examine the second and third elements. Dr. Deborah Wasserman's affidavit is not examined because it addresses the second element—a disparity that is not fair and reasonable.

**23.** Although there is precedent to support the view that a defendant in a criminal case has third party standing to bring the equal protection claims of individuals excluded from jury service, these cases all involve claims of racial discrimination. See Powers v. Ohio, 499 U.S. 400, 410–15, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998); United States v. Ovalle, 136 F.3d at 1104. Presumably, any discrimination on the basis of geography is not nearly as invidious or damaging to the criminal justice system as discrimination on the basis of race. It is, therefore, unclear whether Congressman Traficant meets the injury in fact requirement for third party standing.

Even if the equal protection claim was not time-barred, and assuming that Congressman Traficant could somehow show that he has standing to bring the claim, the equal protection challenge would fail because he cannot establish a prima facie case.

The prima facie case for an alleged equal protection violation in the context of juror section was set forth by the Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The Court explained,

> the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as ... juror, over a significant period of time ... Finally ... a selection procedure that is susceptible [to] abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Id.* These elements were reiterated in *Ford v. Seabold*, 841 F.2d at 688, *Jefferson v. Morgan*, 962 F.2d 1185, 1188–89 (6th Cir.1992), and *Ovalle*, 136 F.3d at 1104.

The first element of an equal protection prima facie case—the existence of a distinct, cognizable group—is the same as that for a fair cross section claim. *See Test*, 550 F.2d at 596, n. 7 (stating that the "cognizability requirement has been consistently reaffirmed by the Supreme Court in cases involving fifth and sixth amendment challenges."); *Herbert*, 698 F.2d 981, 984 (9th Cir.1983) (observing that "[t]he test for a constitutionally selected jury is the same, whether challenged under the fifth and sixth amendments of the Constitution or under the [JSSA]."); *United States v. Underwood*, 617 F.Supp. 713, 719 (D.C.Ala.1985) (stating that "the equal protection analysis employs a prima facie test virtually identical to the one used in the fair-cross section analysis.").

For the reasons discussed above in section E.3., Congressman Traficant cannot demonstrate that the residents of the Youngstown division are a distinct, cognizable group. Geography alone is not enough to establish distinctiveness. Thus, even if it were not time-barred, Congressman Traficant's equal protection challenge could not succeed because the Congressman cannot meet the first element of the prima facie case for an equal protection challenge to the Plan.

### 5. Conclusion

Congressman Traficant's challenge to the Juror Selection Plan of the Northern District of Ohio under the JSSA, Sixth Amendment, and Fifth Amendment fails as a matter of law. Each of the claims is time-barred. Moreover, each of the claims fails on the merits. A hearing on the matter is unnecessary as Congressman Traficant's claims fail as a matter of law and he has presented no allegations that, even if proven true, would entitle him to relief. The use of the Juror Selection Plan of the U.S. District Court for the Northern District of Ohio in this case does not entitle Congressman Traficant to a new trial.

### III. CONCLUSION

For the reasons set forth above, the interests of justice would not be served by granting Congressman Traficant's motion for a new trial. The alternative relief sought by Congressman Traficant under Rule 34, an arrest of the judgments of guilty against him, is inappropriate because the superseding indictment charges

several offenses, over which the Court has jurisdiction.

Accordingly, Congressman Traficant's motion for a new trial is denied.

IT IS SO ORDERED.